[Civ. No. 19958. Fourth Dist., Div. Two. May 22, 1979.]

DALE R. BURGON, Plaintiff and Appellant, v.
KAISER FOUNDATION HOSPITALS et al.,
Defendants and Respondents.

**COUNSEL**

Samuel Shore, Olen G. Miller and John J. Madden, Jr., for Plaintiff and Appellant.

Thelen, Marrin, Johnson & Bridges, Robert K. Worrell and Arthur P. Morello, Jr., for Defendants and Respondents.

**OPINION**

McDANIEL, J.—The question we are here called upon to decide is whether the plaintiff's alleged claim for medical malpractice was barred by the alternative lesser one-year statute of limitations as contained in section 340.5 of the Code of Civil Procedure.[1] At the conclusion of

---

[1] In pertinent part Code of Civil Procedure section 340.5 reads: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence

plaintiff's case the defendants moved for a nonsuit, and the motion was granted on the basis of the affirmative defense noted. Thereafter judgment was entered for defendants and plaintiff appealed. In our view, the statute was properly applied, and so the judgment is affirmed.

## FACTS

The following narrative of events has been gleaned from the testimony at trial as well as from answers to interrogatories put to plaintiff and from plaintiff's deposition, both latter items adduced as evidence during the trial.

In August of 1968 Dale Burgon (plaintiff) developed an aggravated skin condition over sensitive areas of his body. Soon thereafter he sought medical attention at Kaiser Hospital in Fontana. Plaintiff was referred to the dermatology clinic of the hospital and consulted with at least two doctors, including a Dr. Gordon. Dr. Gordon prescribed the drug Diasone for the skin malady and told plaintiff that it was a "dangerous" drug.

After some months of treatment, plaintiff was put on the drug Sulfapyridine but it caused some stomach upset. Late in 1968 plaintiff was put on the drug Avlosulfon prescribed either by Dr. Gordon or Dr. Rappaport. Plaintiff continued to be treated by Dr. Gordon through 1969 and 1970, seeing him once or twice a month. In December of 1970 the administration of the Diasone was stopped. Also in December of 1970, because he was dissatisfied with Dr. Gordon, plaintiff changed to Dr. Rappaport.

In May or June of 1971 plaintiff began to notice a weakness developing in his right hand. He went to the Kaiser Hospital walk-in clinic, and the attending physician commented upon the bluish or purplish color of plaintiff's lips. These visits to the hospital continued over almost an 18-month period, but the muscular weakness continued to increase. Over this period there were numerous tests, but the doctors could not diagnose plaintiff's malady.

should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

On the evening of November 7, 1972, plaintiff collapsed at work. He was unable to walk and was taken to Kaiser Hospital by ambulance. He was seen by a doctor at the walk-in clinic who only prescribed home rest. However, he returned to the hospital three or four days later and was seen by Dr. Harrah. Further tests and physical therapy were ordered. By then the muscles in plaintiff's legs, hands and feet were wasting away and he could barely walk or stand.

Finally, in mid-December of 1972 Dr. Rappaport telephoned plaintiff at home and asked that he come to the office. According to plaintiff's answer to a written interrogatory read into evidence, "[h]e [Dr. Rappaport] told me that the pills (Avlosulfon) I was taking were causing the wasting away of the muscles in my hand, legs and feet. He gave me a different pill to take (Sulfapyridine). In about six months I started to regain the use of part of my muscles. [¶] Dr. Harrah gave me a total disability about March 1973. In April 1974, I asked Dr. Harrah if I could try to go back to work. My muscles at that time were not back to normal, but I wanted to get back to work instead of lying around."

According to plaintiff's testimony at trial, the side effect of muscle wastage attendant to his peripheral neuropathy began in May of 1971 and became increasingly severe until he was taken off Avlosulfon in mid-December of 1972.

Plaintiff's deposition was read into evidence at the trial and included the following:

"Q. When was the first time it occurred to you that the doctors had administered these little white pills improperly to you?

"A. When Doctor Rappaport called me in and took me off of them.

"Q. It occurred to you at that time that they shouldn't have been giving you those pills?

"A. Right.

"Q. And that was in May of '71?

"A. That was in May of—No. That was in December of '72."

Additional testimony at trial included the following:

"Q. (By Mr. Worrell:) Doctor Rappaport told you that the pills had caused the problem?

"A. Yes. We talked about it and he thought that they did and he took me off the pills.

"Q. He said the pills are causing the problem, I'm going to take you off of them?

"A. Right.

"Q. And he showed you an article about the drug?

"A. Yes.

"Q. This was in December of 1972?

"A. Yes."

On January 11, 1974, plaintiff filed his complaint for malpractice against Kaiser Foundation Hospitals, a nonprofit corporation, Kaiser Foundation Health Plan, Inc., a nonprofit corporation, Southern California Permanente Medical Group, a partnership, Ayerst Laboratories, a corporation; and Does 1 through 70, inclusive (defendants) alleging "[t]hat in the aforesaid examination and diagnosis of plaintiff, the prescription of medicines and drugs, the handling and control of the care and treatment of plaintiff, defendants, and each of them, negligently failed to possess and to exercise that degree of knowledge and skill ordinarily possessed and exercised by other physicians and surgeons, hospitals, nurses, attendants, and the like, engaged in said profession in the same or similar locality as the said defendants, and each of them, and so negligently failed to diagnose plaintiff's condition and so negligently treated and cared for him and so negligently prescribed drug therapy that plaintiff was caused to and did suffer the injuries and damages hereinafter alleged. [¶] Plaintiff did not discover or have reason to discover the negligence of defendants, and each of them, until April 2, 1973, when he consulted other doctors and physicians who, for the first time, informed plaintiff of facts disclosing defendants' negligence. [¶] As a proximate result of said conduct of defendants, and each of them, plaintiff was injured in body, in mind and caused to suffer great mental and physical pain and suffering and some permanent disability, all to his general damage in the sum of five hundred thousand ($500,000.00) dollars."

As previously noted, at the conclusion of plaintiff's presentation of his case in chief, defendants moved for a nonsuit based upon the statute of limitations as contained in section 340.5 of the Code of Civil Procedure.

The motion was granted, providing the basis for a judgment for defendants, and plaintiff appealed.

## ISSUES AND DISCUSSION

■ As stated by plaintiff in his opening brief, "[t]he issue in this case is quite simply when did the appellant discover, or through the use of reasonable diligence should he have discovered negligent treatment and injury he received from respondents as prescribed by Section 340.5 of the *Code of Civil Procedure.*" Plaintiff alleged that he actually discovered the negligent treatment April 2, 1973; whereas defendants successfully argued to the trial court that plaintiff's discovery of the alleged malpractice occurred in mid-December of 1972.

Before proceeding to the task of reviewing the evidence which is probative of when plaintiff discovered defendants' alleged malpractice, it is necessary to determine just what that alleged malpractice was. In plaintiff's filing in opposition to the motion for nonsuit it is recited, "Mr. Burgon's injury is alleged to be the result of the continuing of giving of a drug after the side affects [*sic*] of interest, peripheral neuropathy, was first noted." This is corroborated by the dialogue between the trial court and counsel for plaintiff at the argument of the motion.

"THE COURT: I have to, for the purpose of assessing the plaintiff's case here, assume that the prescribing of this drug caused the neurological condition and that the prescribing of that drug and continuing administration of the drug was negligent.

"MR. PAUL: No, your Honor. And that's where I think we're getting into a bind. We have not stated, and we have not attempted to prove in this courtroom, that the prescribing of the drug was negligent.

"THE COURT: But the continuing administration of the drug is negligent, right?

"MR. PAUL: After the side effect evidenced itself and the doctors discovered it. That is the injury. That is the injury."

The foregoing is significant for plaintiff states that "[t]he key questions in appellant's case are the definition of the negligence and the definition of 'discovery.' [¶] Beginning with negligence. Appellant did not contend that the giving of the drug Avlosulfon for his dermatological condition

was negligent. To the contrary, his own experts testified it was the drug of choice. Therefore, Mr. Burgon's knowledge that the drug could or possibly caused his condition was not the 'discovery' of negligence. [¶] The negligence was Dr. Rappaport's *continuing* to give the medication when he suspected a year before he ceased the drug that it could be causing the nervous disorder."

Therefore, according to plaintiff, "the question becomes: When was Mr. Burgon put on notice that the doctors had known for over one year that his condition was possibly caused by the drug, yet they continued it?"

Plaintiff argues convincingly, "[c]ould Mr. Burgon gain that knowledge from a doctor who informs him that an article had just come to his attention, and mentions nothing of his knowledge one year before. Can it be said that Mr. Burgon should have suspected, despite what the doctor said, that he did know one year before. Appellant suspects that step is too much to ask of a lay person who relies on his doctor and who has a continuing patient-physician relationship." However, plaintiff's argument fails because it neglects to face up to the clear implications of the record.

We have already tabulated the plaintiff's answer to a particular interrogatory and to certain of his deposition testimony. On the other hand, an examination of the trial testimony (the reporter's transcript of the taking of testimony at the trial extends to only 121 pages) reveals that no evidence was offered to support plaintiff's allegation that he "discovered" the alleged negligence of defendants on April 2, 1973. Actually, the only testimony adduced at the trial which was in any way inconsistent with the facts developed during pretrial discovery and otherwise during the trial occurred when plaintiff tried to contradict his own earlier testimony about when it had first occurred to him that the drug Avlosulfon had been prescribed improperly. That testimony occurred during questioning by Mr. Worrell, counsel for defendants:

"Q. (By Mr. Worrell:) Doctor Rappaport told you that the pills had caused the problem?

"A. Yes. We talked about it and he thought that they did and he took me off the pills.

"Q. He said the pills are causing the problem; I'm going to take you off of them?

"A. Right.

"Q. And he showed you an article about the drug?

"A. Yes.

"Q. This was in December of 1972?

"A. Yes.

"Q. It was at that time that it first occurred to you that the drug had been administered improperly, isn't that true?

"A. No."

At that point Mr. Worrell proceeded by use of plaintiff's deposition and his answer to an interrogatory (items quoted earlier in this opinion) to impeach categorically the foregoing "No" answer. Because of this impeachment, the self-serving denial just noted was properly disregarded by the trial court as unreliable.

At oral argument, the issue arose over whether there was any evidence in the record to support the plaintiff's allegation that he had discovered the alleged negligence of defendants on April 2, 1973. Mr. Shore for plaintiff then proceeded into a detailed recitation of events involving an interview of plaintiff by then Attorney Matthew Kearney out of which interview the discovery was made. The court expressed its doubts that the record contained any such evidence, and counsel for defendants was asked directly if there were *any* evidence in the record to support the allegation of discovery on April 2, 1973, or at any time after December 1972. Counsel for defendants answered categorically that there was no such evidence.

Leave was then accorded plaintiff's counsel to file an additional memorandum citing the court to those places in the transcript where such evidence could be found. The court has reviewed that memorandum very carefully, and there is not a single reference therein to the transcript wherein there appears evidence of discovery of the defendants' alleged negligence on April 2, 1973, or indeed at any time after December 1972. As a consequence, it is correct to observe: (1) that the only evidence which the trial court had before it on the issue of plaintiff's discovery of the alleged negligence was that which we have already recited; and (2) that there was no evidence whatsoever before the trial court to show a discovery by plaintiff of defendants' alleged negligence on April 2, 1973, or at any time after December of 1972.

In our view, the trial court correctly evaluated the legal impact of all the evidence before it in the commentary by the court during the oral argument of the nonsuit. The trial court rightly concluded that a litigant seeking to avoid the effects of filing suit more than one year after the advent of the alleged malpractice must not only plead, but also prove, discovery of the alleged malpractice within the one-year period, as prescribed by the statute of limitations, next preceding the filing date. As already noted, plaintiff offered no evidence regarding the time of discovery; as against all of his admissions of such discovery in mid-December of 1972, on only one occasion during trial he simply denied that such discovery occurred at that time.

In the context of the nonsuit motion, the evidence even when viewed most favorably to plaintiff, showed: (1) to remedy plaintiff's skin malady he was given the drug Avlosulfon over a period of several years; (2) the plaintiff knew he was being dosed with Avlosulfon; (3) plaintiff was aware increasingly over the months leading up to mid-December 1972 that certain of his muscles were wasting away; (4) on December 15, 1972, more than one year before the action was filed, plaintiff was given specific information by Dr. Rappaport, the prescribing physician, which linked the drug Avlosulfon with the cause of plaintiff's peripheral neuropathy then diagnosed as plaintiff's side effect suffered from the administration of Avlosulfon; (5) on the other hand, there was no evidence to support the allegation by plaintiff that he discovered the alleged malpractice on April 2, 1973.

Based upon the foregoing the trial court concluded that plaintiff was on notice of the previously continuing improper administration of the drug Avlosulfon as early as December 15, 1972, for the dosage was terminated on that date. In this connection, the court summarized its evaluation of the evidence as: "I think that when in this case Mr. Burgon was told that the drug avlosulfon was the cause of his problem, that he was constructively on notice that the drug was either negligently prescribed, administered, or that his condition was negligently diagnosed and that the statute of limitations under the provisions of Section 340.5 of the Code of Civil Procedure as it existed in 1972, commenced, and that the burden is on the plaintiff to take himself out from under the provisions of that statute. He has that burden and there has not been any evidence introduced in this case that would in anywise take him out from under the operation of that statute. The fact that he has affirmatively alleged a date that is subsequent of the December 15, 1972, date as being the date of discovery, does not supply the want of evidence of that fact."

Turning to precedent such as may provide support for the foregoing a priori analysis, it has been held, if a plaintiff fails to offer proof in avoidance of the statute of limitations establishing his discovery of alleged medical malpractice less than one year before filing the action, that such case presents an issue of law. (*Wells Fargo Bank* v. *Superior Court,* 74 Cal.App.3d 890 [141 Cal.Rptr. 836].) As stated in *Wells Fargo,* "[w]hen there is no dispute over the decisive facts, the question of limitations is one of law . . . ." (*Id.,* at p. 895.)

That brings us to the issue of whether there is a "dispute" over the decisive facts on the face of this record. We have already reviewed the evidence before the court, namely the unequivocal answers of plaintiff to the interrogatory and to questions put to him during his deposition and during the trial. These answers squarely establish the occasion for invoking the statute of limitations. Arrayed against this evidence, however, is the single word "No" in response to the question, "[i]t was at that time [December 15, 1972] that it first occurred to you that the drug had been administered improperly, isn't that true?" Does this create a dispute?

That brings us to a discussion and application of *Gray* v. *Reeves,* 76 Cal.App.3d 567 [142 Cal.Rptr. 716]. *Gray* involved a very similar set of facts. The plaintiff there suffered from the side effects of a drug which had induced the onset of aseptic necrosis, a condition of degeneration of the hip socket. In the medical malpractice case which followed, the defendant sought a summary judgment based upon the bar of the statute of limitations. In *Gray,* parallel to what happened in the case before us, the defendants moved for summary judgment on the grounds the complaint was barred by the statute of limitations, based on plaintiff's answers to interrogatories and plaintiff's deposition. The trial court refused to receive the deposition into evidence because it had not been signed, and denied the motion. In the deposition plaintiff stated he was told by the doctor in 1971 his hip problems were probably caused by the drug, and also stated he felt at that time the doctor had done something wrong. Thereafter, defendants moved for leave to file plaintiff's deposition over the signature of the court reporter pursuant to Code of Civil Procedure section 2019, subdivision (d), and for summary judgment. Plaintiff filed a counterdeclaration incorporating an earlier one stating that while he knew in 1971 that the drug was the cause of his injury, he did not know the 'negligent' cause or that it was a result of the doctor's acts or omissions. Plaintiff also signed the deposition after making certain corrections. The trial court then granted the motion for summary

judgment and entered judgment in favor of defendants. On appeal the judgment was affirmed.

In dealing with plaintiff's latter-day effort to establish an issue of fact, the court said, "[w]e are also mindful of the rule expressed in *Leasman* v. *Beech Aircraft Corp.,* 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768], . . . that when a defendant can establish his defense with the plaintiff's admission sufficient to pass the strict construction test imposed on the moving party, the credibility of the admissions are valued so highly that the contradicting affidavits may be disregarded as irrelevant, inadmissible or evasive (see also *D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10] . . .; *King* v. *Andersen,* 242 Cal.App.2d 606, 610 [51 Cal.Rptr. 561] . . .). The reason for this rule was spelled out in *D'Amico, supra,* which at page 22 states, '. . . admissions against interest have a very high credibility value. This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts.' (See Bauman: *California Summary Judgment: A Search For a Standard,* 10 UCLA L.Rev. 347.) [¶] There is no reason to draw a distinction between an attempt to counter an admission by affidavit and an attempt to counter an admission by changing the content of an answer given by a party directly in the deposition, especially where there is no assertion the original answer was incorrectly transcribed or the question was misleading or ambiguous. In both the changed affidavit and changed deposition cases the credibility of the parties is held up for examination by the contradicting statements, the first of which constitutes a reliable admission against interest. The trial court may accept the first and reject the later of these contrary positions." (*Id.,* at pp. 573-574.)

This is just what the trial court did in the case before us. As previously observed, the court rightly disregarded the "No" answer as unreliable.

Finally, there is the matter of where the burden of coming forward with the evidence falls as it is involved in this case. Accepting that the alleged malpractice began before January 11, 1973 (a date one year before the action was filed), defendants sought to invoke the bar of the statute of limitations and actually introduced evidence, including the answers to interrogatories and plaintiff's deposition to establish that plaintiff discovered the implications of malpractice such as to put him on notice requiring reasonable inquiry as of December 15, 1972.

At that point, defendant had made a prima facie case for application of the statute, and in the context of a prospective nonsuit motion the burden of going forward with the evidence shifted to plaintiff. In discharging this burden plaintiff simply contradicted his earlier testimony and his admissions. As we have noted per *Gray,* that effort was ineffective to create a factual issue.

■ Translated into the language of the authority, "[i]t is fundamental that a litigant who relies on facts [alleged] in order to avoid the bar of the statute of limitations bears the burden of proving such facts. [Citations.]" *(DeVault* v. *Logan,* 223 Cal.App.2d 802, 809 [36 Cal.Rptr. 145].) When the plaintiff fails to carry that burden, i.e., to go forward with the evidence, "the trial court properly determined that plaintiff's cause of action was a stale claim when suit was filed." *(Id.,* at p. 809.) Thus it was here.

DISPOSITION

The judgment is affirmed.

Tamura, Acting P. J., and Morris, J., concurred.

A petition for a rehearing was denied June 11, 1979, and appellant's petition for a hearing by the Supreme Court was denied August 15, 1979.