[L.A. No. 31531. Sept. 27, 1982.]

LEONIA BROWN, Plaintiff and Appellant, v.
LEON BLEIBERG et al., Defendants and Respondents.

**COUNSEL**

Sanford M. Gage for Plaintiff and Appellant.

Wood, Tucker & Ward, Bonelli, Wood & Heib, Glen E. Tucker, Stanley M. Sapiro, Hagenbaugh & Murphy and Neil Gunny for Defendants and Respondents.

**OPINION**

**REYNOSO, J.**—We interpret provisions of the statute of limitation dealing with medical malpractice. In the case at bench, we reverse a summary judgment in favor of a podiatrist and a physician despite the passage of over 12 years since the plaintiff's injury. Although the delay in this case was extreme, a triable issue of fact exists whether the doctors' alleged affirmative concealment of the true nature of the surgery prevented plaintiff from discovering that the injury resulted from the defendants' tortious conduct in performing an unnecessary operation. We cannot say as a matter of law that plaintiff's reliance on what they told her was unreasonable.

*1. The facts and proceedings below.*

Plaintiff Leonia Brown appeals from a summary judgment entered against her in a medical malpractice action and in favor of defendants Dr. Leon Bleiberg, a licensed podiatrist, and Dr. Joseph Green, a physician. The basis for the grant of summary judgment was that plaintiff's claim, which arose out of surgery performed on her in 1965, was barred by the statute of limitations. Plaintiff contends that her cause of action did not accrue until June 1978, when she was advised by a podiatrist to whom her lawyer referred her that portions of the bones of her feet had been removed which should not have been. She challenges the trial court's implicit conclusion that, as a matter of law, she either knew or should have known of the injury to her foot *and its negligent cause* over a year before she commenced the present action, on June 21, 1978.

The factual background begins in June or July 1965. Plaintiff complained of foot pain to her family physician, Dr. John Zane (a named but unserved defendant), who referred her to defendant Bleiberg. Bleiberg informed her that she needed surgery to remove some corns. The operation was performed at Mid-City Hospital in July 1965. Defendant Green was the attending anaesthesiologist; before the operation he spoke to plaintiff reassuring her that she "had nothing to worry about" and that he had often seen Bleiberg perform such foot surgery.

After the surgery, plaintiff was in great pain and observed that her feet were "all cut up . . . ." Bleiberg assured her that nothing was amiss, that he had found and removed "a whole lot of little tumors and they were going to be painful." After her discharge from the hospital she continued under Bleiberg's care, going to his clinic every other day for therapy. During this time she was making continual complaints to him about the pain in her feet, and was taking codeine pills for two or three months after the operation. Bleiberg gave her no further explanation than the removal of the tumors, but assured her that "it would be all right." She continued to see him until he moved, sometime before the end of 1965. She remained in Dr. Zane's care until he, too, moved away in 1972.

Plaintiff's deposition testimony and answers to interrogatories were offered by Bleiberg in support of his motion for summary judgment. Her feet never improved. They splayed when she walked; she felt she walked "like a duck." If she had occasion to stand for any prolonged period, she was often unable to walk the next day. This has kept her from working. Her friends ridiculed her "ugly" feet and asked her, "Who was the doctor who cut you up?" Plaintiff's niece, a registered nurse, urged her on more than one occasion between 1965 and 1974 to have her feet "checked" by a doctor.

Plaintiff did not consult a physician about her foot problems; she "just had it in mind that they were going to be all right." Two or three years after the operation, her welfare caseworker referred her to a doctor for a "checkup." He asked her why her feet were "cut up like that." When she replied that she had had some corns removed, he asked why "they had to do all that to take a corn off?" Plaintiff said she did not remember. In 1975, she had another occasion to see a doctor when, due to weakness in her foot, she fell and broke her ankle and had to be hospitalized. She told the doctor who treated her that she had had prob-

lems walking, on and off, since the surgery. The record does not show his response.

In June 1978, plaintiff heard through a family member about another person who had had similar foot surgery performed by Dr. Bleiberg and subsequently sued him for malpractice. The relative urged plaintiff to contact the lawyer representing the other patient. She promptly did so, and was referred by him to a podiatrist who examined her and advised her that "the operation performed upon [her] was not a procedure to remove tumors but was a procedure that removed portions of the bones of the feet." She filed suit on June 21, 1978.

Plaintiff also testified in her deposition that she had an 11th-grade education, and had taken a 9-month adult education course in practical nursing in 1959 at a high school. She acted as an assistant school nurse in connection with the training, but, according to her declaration in opposition to the motion for summary judgment, she received "no hospital training or in service instruction." Further, she declared: "This background did not qualify me to diagnose my foot condition but probably conditioned me to be more accepting of the doctor's diagnosis and explanation for the condition of my feet since I basically had trust and confidence in them."

### 2. The statutes of limitations.

The applicable statutes of limitations here are Code of Civil Procedure sections 340, subdivision 3 (governing a variety of actions for personal injuries, including battery) and 340.5 (governing actions for "professional negligence").[1]

---

[1]In her complaint, plaintiff alleges negligence in defendants' failure to secure her informed consent and in their performance of the operation; battery (based on defendants' performance of a different surgical procedure than that to which she consented (see *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 239 [104 Cal.Rptr. 505, 502 P.2d 1])); and breach of warranty (see *Depenbrok* v. *Kaiser Foundation Health Plan, Inc.* (1978) 79 Cal.App.3d 167 [144 Cal.Rptr. 724]). Concerning the last theory, plaintiff alleges that defendants obtained her consent to undergo the operation by representing that the surgery they contemplated was a minor procedure, a "simple and uncomplicated removal of calluses," from which she would recover completely within a few weeks' time, all the while intending to perform "major foot surgery" on her. The breach of warranty cause of action, as well as that for battery, is governed by section 340, subdivision 3, since it is alleged to have resulted in personal injuries. (*Rubino* v. *Utah Canning Co.* (1954) 123 Cal.App.2d 18 [266 P.2d 163]; *Howe* v. *Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330, 339 [68 Cal.Rptr. 617].)

Section 340 prescribes a one-year limitations period. Prior to the enactment of section 340.5 in 1970, the limitations period for all medical malpractice actions was the one-year term provided by section 340, subdivision 3, which applies generally to actions for personal injury or death. It was established, though, that the limitations period did not commence until the plaintiff actually discovered his injury and its negligent cause or could, in the exercise of reasonable diligence, have discovered them. Thus, commencement of the running of the statute might be deferred indefinitely. (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 96-97 [132 Cal.Rptr. 657, 553 P.2d 1129]; see also *Whitfield v. Roth* (1974) 10 Cal.3d 874, 885 [112 Cal.Rptr. 540, 519 P.2d 588]; *Stafford v. Shultz* (1954) 42 Cal.2d 767, 776 [270 P.2d 1]; *Mock v. Santa Monica Hospital* (1960) 187 Cal.App.2d 57, 64 [9 Cal.Rptr. 555].)

Repeated efforts to modify this "open-ended" discovery doctrine culminated in the enactment in 1970 of Code of Civil Procedure section 340.5, which governs actions based on "professional negligence" by "health care provider[s]." As enacted, the statute retained the former one-year limitations period, but circumscribed it with an outside period of four years from the date of plaintiff's "injury," irrespective of whether its negligent cause had or should have been discovered.[2] At the same time, the Legislature reflected a concern about the fairness of applying the four-year period to a plaintiff whose failure to discover his cause of action stemmed from the failure of the health care provider to fulfill a fiduciary obligation to disclose errors and omissions. Thus, the enactment also provided that the four-year period was "'tolled for any period during which [the treating physician or hospital] . . . has failed to disclose any act, error, or omission upon which such action is based and which is known or through the use of reasonable diligence should have been known to him.'" (*Sanchez v. South Hoover Hospital, supra,* 18 Cal.3d at pp. 95-98.)

In 1975, section 340.5 was amended to shorten the outside limitations period to three years. There were other substantial changes, including some restriction of the scope of the tolling provision: " . . . In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) inten-

---

[2]The section provided in pertinent part that the limitations period was "four years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever first occurs. . . ." (Stat. 1970, ch. 360, § 1.)

tional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person...."

We consider the effect on plaintiff's action of the one-year limitations periods provided both in section 340, subdivision 3, and section 340.5 in the next part of this opinion. In the succeeding part, we treat the three- and four-year outside periods prescribed by section 340.5, which affect only the negligence causes of action.

*3. The one-year period.*

Plaintiff contends that there is a triable issue of fact whether she was prevented from becoming aware of the tortious cause of her foot problems following the operation by defendant Bleiberg's misrepresentations as to the nature and necessity of the operation.

In her declaration in opposition to defendant Bleiberg's motion for summary judgment, plaintiff asserted that Bleiberg and Zane reassured her after the operation that it was "necessary" to remove some tumors from her feet and she "accepted their explanation." Further, "[b]ecause I trusted and had confidence in Dr. Zane and also Dr. Bleiberg, I believed their explanation that the reason I had painful and unattractive feet was due to the existence of 'tumors' in the feet which had to be removed at surgery.... Although other persons suggested that I seek other medical care and did ridicule the appearance of my feet, I was satisfied by the explanations concerning the treatment and care rendered by Dr. Bleiberg and Dr. Zane and did not feel that it was necessary to obtain a third consultation.... Because of the misrepresentations concerning the nature of the procedure and the necessity therefore [*sic*], I was mislead [*sic*] into not seeking further medical evaluation of my foot problem at an earlier date and accepted the doctors [*sic*] explanation for the appearance and pain in my feet as a totally reasonable and honest one...."

Defendants counter that, plaintiff's declaration notwithstanding, no triable issue has been raised because her admissions in her deposition and her answers to defendants' interrogatories were sufficient to establish that with the exercise of reasonable diligence she should have been aware of her injury and its negligent cause. Her declaration, they say, may be disregarded as irrelevant. (See *Gray* v. *Reeves* (1977) 76 Cal. App.3d 567, 573-574 [142 Cal.Rptr. 716]; *Burgon* v. *Kaiser Founda-*

*tion Hospitals* (1979) 93 Cal.App.3d 813, 822-823 [155 Cal.Rptr. 763]; see also *Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 383 [121 Cal.Rptr. 768].)[3] They argue that plaintiff was put on notice of their negligence by the fact that the pain persisted for over 12 years, her friends' ridicule, her niece's urgings to have her feet checked, her 2 contacts with physicians between 1965 and 1978, and her own practical nursing training.

Recalling that it is a summary judgment under review, we are persuaded reasonable minds could differ (*Wozniak* v. *Peninsula Hospital* (1969) 1 Cal.App.3d 716, 725 [82 Cal.Rptr. 84]; *Enfield* v. *Hunt* (1979) 91 Cal.App.3d 417, 419-420 [154 Cal.Rptr. 146]; *DeVault* v. *Logan* (1963) 233 Cal.App.2d 802, 809-810 [36 Cal.Rptr. 145]) as to the sufficiency of plaintiff's explanation that she was prevented from suspecting defendants' negligence by Dr. Bleiberg's misrepresentations about the nature of the surgery he performed and why he performed it. Plaintiff says she was told by Bleiberg that the surgery which resulted in the pain and disfigurement of the feet was necessitated by his discovery of "tumors" there. So far as she knew, her condition was an unavoidable consequence of a "necessary" operation.[4]

To foreclose her raising an issue of justifiable reliance on these representations, plaintiff's admissions would have had to establish "beyond dispute" (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at p. 101) not only that she knew that her feet were injured as a result of the operation, but also that she knew or should have known that the in-

---

[3]*Gray* and *Burgon* are distinguishable, however. In both cases, the plaintiff had admitted in his deposition that he felt that his physician had made a mistake more than a year before he brought suit. (*Gray, supra,* at p. 574; *Burgon, supra,* at p. 816.) Here, plaintiff insists that she was kept from suspecting defendants' negligence by Dr. Bleiberg's misrepresentations about the nature of the surgery he performed and why he performed it.

[4]This distinguishes the instant case from decisions which hold that a plaintiff is put on inquiry notice of negligence on the part of the defendants if he becomes aware that his condition has been misdiagnosed or incorrectly treated and injury follows. (*Gray* v. *Reeves, supra,* 76 Cal.App.3d at pp. 576-577 [plaintiff suffered reaction to drug prescribed by defendant]; *Mock* v. *Santa Monica Hospital* (1960) 187 Cal.App.2d 57, 66 [9 Cal.Rptr. 555] [plaintiff suffered serious and painful injury to another part of his body during operation]; *Tell* v. *Taylor* (1961) 191 Cal.App.2d 266, 270-271 [12 Cal.Rptr. 648] [defendant failed to discover bone fracture shown by X-rays over a year before suit]; *Hemingway* v. *Waxler* (1954) 128 Cal.App.2d 68, 70-71 [274 P.2d 699] [same]; *DeVault* v. *Logan, supra,* 223 Cal.App.2d at p. 809 [same].) There is no indication in the present record, in contrast, that plaintiff was aware that there was anything incorrect (even if not necessarily negligent or tortious) about the operation in 1965.

jury resulted from defendants' tortious conduct. (*Whitfield v. Roth, supra,* 10 Cal.3d at p. 885; *Wozniak v. Peninsula Hospital, supra,* 1 Cal.App.3d 716, 722.)[5] They do not. Though the pain in her feet persisted for a long time, she could reasonably expect that after serious surgery. Dr. Bleiberg told her that her condition would improve, but did not say when. Neither her friends' ridicule, nor her niece's urgings to see a doctor to have her feet checked,[6] nor her nursing training amount to conclusive evidence that plaintiff was on notice of defendants' wrongdoing. In *Wozniak, supra,* the Court of Appeal rejected a suggestion that the parents were placed on notice of the hospital's negligence by a nurse-therapist's statement to them soon after the injury concerning

---

[5]In *Wozniak,* though the parents were aware that their child manifested nerve and brain damage after an operation, they had no specific information that the abnormal condition was due either to the operation itself or to lack of hospital care. There was no indication that they were ever informed by the hospital or the treating physicians of the cause of the injury or the end result to be anticipated. The child continued receiving treatment after her discharge from the hospital and the parents believed her condition might improve. The appellate court reversed a summary judgment for defendants based on the parents' failure to file a timely claim under the Tort Claims Act. Although the parents delayed 11 months in seeking to bring an action against the hospital, the court held "[t]he trier of fact could be justified in concluding that the Wozniaks placed reliance on their physicians and surgeon who had the duty of keeping them informed." (1 Cal.App.3d at p. 725.)

In *Whitfield,* a child was diagnosed originally as suffering not from an organic disease but from anorexia nervosa, a psychiatric disorder. Later, the mother was informed that it *was* an organic disease the child suffered from, craniopharyngioma. Though she was aware that there had been a misdiagnosis, we observed that the mother "did not know whether the craniopharyngioma was detectable nine months earlier; whether, if detectable, the County was negligent in not detecting its existence; or whether, the County did detect its possible existence and then negligently failed to pursue the diagnosis; or whether the County did detect its existence and decided not to reveal its presence; or indeed, whether the failure to detect the tumor contributed to the tragic side effects of its removal." (10 Cal.3d at p. 887.) We concluded that on the record before us we could not say "*as a matter of law* that [the mother] 'through the exercise of reasonable diligence should have discovered [the negligent cause of the injury].'" (*Id.,* at p. 888.) (See also *Osborne v. County of Los Angeles* (1979) 91 Cal.App.3d 366, 370 [154 Cal.Rptr. 129] [question was when plaintiff knew a screw was "*improperly*" left in his hip]; *Romo v. Estate of Bennett* (1979) 97 Cal.App.3d 304, 306-307 [158 Cal.Rptr. 635] [issue of fact as to when father discovered the possibility that baby's blindness was due to administration of oxygen to him at birth]; *Jones v. Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700, 702-703 [153 Cal.Rptr. 662] [issue of fact as to when plaintiffs should have known defendants' misdiagnosis of child's meningococcemia as "flu" was negligent]; *Enfield v. Hunt, supra,* 91 Cal.App.3d 417 [plaintiff's "reasonable diligence" was an issue of fact since he had no reason to believe nerve damage he suffered in an operation was avoidable and he was advised that temporary damage could result in the absence of negligence but he would have a cause of action if the condition became permanent].)

[6]We note that there is no indication that the niece suggested the possibility of malpractice; so far as the record shows, she merely thought that plaintiff's problems might be amenable to treatment.

such possible negligence. It noted that "the record [was] silent as to the background and training that might qualify the nurse-therapist to render an opinion on that subject. It appear[ed] reasonable to conclude that the cause of [the child's] condition was far beyond the sphere of the nurse-therapist's knowledge." (1 Cal.App.3d at p. 724.) In neither of plaintiff's contacts with physicians after 1965 was there, so far as the record shows, a suggestion of malpractice. Though one doctor expressed surprise that such extensive surgery was required to remove corns, Bleiberg's explanation after the operation was, of course, that he discovered during the surgery that he had to remove "a whole lot of little tumors" as well.

It was stated in *Wozniak, supra,* that "[t]he question of when there has been a belated discovery of the cause of action, especially in malpractice cases, is essentially a question of fact ... [and] [i]t is only where reasonable minds can draw but one conclusion from the evidence that the question becomes a matter of law." (1 Cal.App.3d at p. 725.)[7] Thus, we are reluctant to say, *as a matter of law,* that plaintiff could not reasonably rely on defendant Bleiberg's explanation of her continuing foot problems so that she was prevented from discovering the tortious cause of her injury. We conclude the trial court erred in granting summary judgment. At the same time, we emphasize that "[w]e do not decide the issue as to the time of accrual of [plaintiff's] cause of action but only that that the issue exists and is to be determined by the trier of fact." (*Id.,* at p. 726.)

---

[7]The *Wozniak* opinion quotes *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785] as stating the "well settled" law to be applied in summary judgment: "'The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits [or evidence obtained by discovery proceedings] in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.'" (1 Cal.App.3d at p. 722, see also *Gray* v. *Reeves, supra,* 76 Cal.App.3d at p. 573; *Tell* v. *Taylor* (1961) 191 Cal.App.2d 266, 268-269 [165 Cal.Rptr. 433]; *Bunzel* v. *American Academy of Orthopaedic Surgeons* (1980) 107 Cal.App.3d 165, 169 [12 Cal.Rptr. 648].)

4. *The outside limitations period under Code of Civil Procedure section 340.5.*

■ As we have discussed, Code of Civil Procedure section 340.5 now specifies an outside limit on the period after plaintiff's injury in which an action for "professional negligence" may be commenced, regardless of the patient's belated discovery of the cause of action. Although the statute first was enacted in 1970, after plaintiff's operation, it does affect plaintiff's causes of action based on defendants' negligence (but not the battery or "breach of warranty" causes). ■ The 1970 enactment and the 1975 amendment, which prescribed a four-year and a three-year limitations period, respectively, could not be given retroactive effect so as to wipe out plaintiff's claim,[8] but the Legislature may restrict the period of limitations on a pending claim so long as the plaintiff is given "a reasonable time in which to sue." (*Wells Fargo Bank* v. *Superior Court* (1977) 74 Cal.App.3d 890, 898 [141 Cal.Rptr. 836]; *Osborne* v. *County of Los Angeles, supra,* 91 Cal.App.3d at p. 371; *Niagara Fire Ins. Co.* v. *Cole* (1965) 235 Cal.App.2d 40, 43 [44 Cal.Rptr. 889].) A statute shortening the statute of limitations may be interpreted prospectively to avoid constitutional problems which would attend retroactivity. (*Ibid.*) In *Scott* v. *County of Los Angeles* (1977) 73 Cal.App.3d 476 [140 Cal.Rptr. 785], the Court of Appeal apparently interpreted section 340.5 as it was enacted in 1970 to give the plaintiff four years from the statute's effective date to bring suit for negligence in failing to properly administer oxygen to a baby at the time of his birth in 1960 where the cause of action under the one-year limitations period did not accrue until 1975. No basis appears here upon which to conclude that plaintiff was not afforded a reasonable time after the enactment of section 340.5 in which to bring her action. We have determined, however, that, for purposes of this summary judgment, the outside limitations period of section 340.5 was tolled by its own terms.

■ Plaintiff's factual claim that defendant Bleiberg misrepresented the nature of the operation he performed on her in order to conceal plaintiff's cause of action creates an issue for the trier of fact as to whether the four-year and three-year limitations periods were tolled until plaintiff discovered the negligent cause of her injury. (Cf. *Sanchez* v.

---

[8]Plaintiff's "injury" occurred at the point at which "appreciable harm" was first manifested. (*Bispo* v. *Burton* (1978) 82 Cal.App.3d 824, 831 [147 Cal.Rptr. 442]; cf. *Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 656, fn. 11 [135 Cal.Rptr. 75, 557 P.2d 507].) This appears to have occurred immediately after the operation.

*South Hoover Hospital, supra*, 18 Cal.3d at pp. 99-100 [plaintiff admitted in deposition that she believed defendant guilty of malpractice soon after operation, ending tolling of statute].) A trier of fact could reasonably conclude that, in light of the fiduciary relationship between plaintiff and Bleiberg, plaintiff was justified in accepting his explanation for her condition following the operation.[9] Thus, summary judgment for defendant Bleiberg was not justified on the basis of the outside limitations period either.

■ The same is true of plaintiff's negligence causes of action against Dr. Green. We may assume that Dr. Bleiberg's concealment of the cause of action would not toll the statute as to Green absent his participation in the scheme, since the rationale of the tolling doctrine is estoppel. (*Sanchez, supra*, 18 Cal.3d at p. 100; *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 231-232 [153 P.2d 325].) Plaintiff alleged such participation in her complaint. It is true that a court may not consider the allegations of the complaint *"except to the extent that they are not controverted by affidavits on either side."* (Original italics.) (*Cox* v. *State of California* (1970) 3 Cal.App.3d 301, 309 [82 Cal.Rptr. 896]; *McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 82 [150 Cal.Rptr. 730]; *Conn* v. *National Can Corp.* (1981) 124 Cal. App.3d 630, 639 [177 Cal.Rptr. 445].) But there were no controverting affidavits here. In fact, there was no motion; after defendant Bleiberg's motion had been granted by the trial court, the parties stipulated that Dr. Green could be deemed to have moved for summary judgment and had it granted at the same time as Bleiberg, and that "the facts pertaining to Defendant Green's motion for summary judgment ar [*sic*] the same as for defendant Bleiberg's, as to the issue of the statute of limitations." Bleiberg's motion was accompanied only by a declaration by his

---

[9]Plaintiff stopped seeing Dr. Bleiberg when he moved in 1965, so the "diminished" level of required diligence referred to in *Sanchez* for a patient still under the care of the defendant physician is not strictly applicable. (18 Cal.3d at p. 102.) However, the standard of diligence to be expected of a former patient cannot ignore the fiduciary relationship that existed between him and his doctor. During the continuation of the relationship, courts have given plaintiffs the benefit of an "assumption" of continued reliance so that the tolling effect of nondisclosure or concealment will also continue absent unusual circumstances which should put the patient on notice thereof. (*Wells Fargo Bank* v. *Superior Court, supra*, 74 Cal.App.3d at p. 898; see, e.g., *Myers* v. *Stevenson* (1954) 125 Cal.App.2d 399, 401 [270 P.2d 885]; *Enfield* v. *Hunt, supra*, 91 Cal.App.3d at pp. 422-423.) Such reliance on the fiduciary role of the physician may naturally continue after the physician-patient relationship has terminated, though. (*Wells Fargo Bank, supra*, 74 Cal.App.3d at pp. 897-898; see *Costa* v. *Regents of Univ. of California* (1953) 116 Cal.App.2d 445, 454 [254 P.2d 85].) There was nothing in the circumstances in which plaintiff discontinued her treatment by Dr. Bleiberg to suggest any loss of trust in him.

attorney setting out portions of plaintiff's deposition testimony and answers to interrogatories as previously summarized in this opinion. Although the only incident referred to by plaintiff as indicative of Green's participation in a scheme to conceal from her the true nature of the surgery performed on her apparently occurred *before* the operation (when he told her he knew Dr. Bleiberg and had seen him perform the same surgery many times before and reassured her that she "had nothing to worry about"), there was nothing in the selected testimony and answers that negated Green's participation. Green had the burden of negating the existence of concealment which would toll the running of the statute of limitations on summary judgment, despite the fact that the burden of proof would be on plaintiff at trial. (*Segura* v. *Brundage* (1979) 91 Cal.App.3d 19, 28-30 [153 Cal.Rptr. 777]; *Conn* v. *National Can Corp., supra*, 124 Cal.App.3d at pp. 639-640.) Failing that, a triable issue of fact remained, and summary judgment should not have been granted.

The summary judgment in favor of defendants Bleiberg and Green is reversed.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., Kaus, J., and Broussard, J., concurred.