[No. B054551. Second Dist., Div. Four. June 15, 1994.]

LEOTA McNALL, Plaintiff and Appellant, v.
WILLIAM K. SUMMERS et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Steven W. Weston and Martha S. Doty for Plaintiff and Appellant.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Peter G. Bertling, Baker, Silberberg & Keener and Robert C. Baker for Defendants and Respondents.

## Opinion

## VOGEL (C. S.), J.—

I

### INTRODUCTION

Appellant Leota McNall appeals from a judgment in favor of respondent psychiatrists William K. Summers, M.D., and Ferris N. Pitts, Jr., M.D., in a medical malpractice case. McNall proceeded on two theories: (1) Drs. Summers and Pitts negligently administered electroconvulsive therapy (ECT) causing her to suffer an embolic stroke with a concomitant memory loss; and (2) Dr. Summers sexually abused her, resulting in emotional injury.[1] The trial was bifurcated to try the issue of the statute of limitations first. At the conclusion of the first phase, the trial court granted a motion for directed verdict finding the ECT action was barred by the statute of limitations and granted a motion for nonsuit on the sexual abuse medical malpractice claim finding that McNall had failed to establish a prima facie case. We affirm the directed verdict and reverse the nonsuit.

II

### FACTUAL AND PROCEDURAL BACKGROUND

In 1979, McNall was a registered nurse and an instructor of nursing at California State University of Los Angeles. She was being treated for depression by her psychiatrist, Dr. David Hall. In the summer of 1979, she was seen by Dr. Summers, who was filling in for Dr. Hall. Rather than resuming with Dr. Hall, she continued to see Dr. Summers through July 1982.

Soon after their relationship began, Dr. Summers recommended McNall undergo ECT to overcome her depression. Dr. Pitts was consulted. He concurred in the recommendation, witnessed McNall's informed consent, and was involved in McNall's ECT treatments.

McNall was first admitted to Las Encinas Hospital in November 1979 where she was given four ECT treatments. She left the hospital before completing the full series but soon returned for readmission and received

---

[1]To differentiate between McNall's two claims, we will, where appropriate, refer to her claim based on the ECT therapy as the "ECT claim" and the other claim against Dr. Summers only as the "sexual abuse claim."

eight more treatments. This regimen made her confused and disoriented and resulted in memory loss.

After Christmas 1979, McNall was readmitted to the hospital and was given eight more treatments over a period of one month. During this time, she experienced severe confusion and memory loss. In February 1980, she received six more treatments as an outpatient at Glendale Adventist Hospital. Her last treatment was administered on March 21, 1980, for a total of 26 ECT treatments over a period of 5 months.

McNall complained to Dr. Summers about her loss of memory. He advised her that her memory would return in four to six months. He also gave her an article he had coauthored which stated: "Memory deficits and confusional states are said to be characteristic side effects of electroconvulsive therapy." He generally assured her that her memory problem would go away. When her memory loss did not improve, Dr. Summers informed her: " 'Well, you have depression, and your memory problems are the result of this type of depression[]' [a]nd . . . said that because of that, that [she] would need a psychiatrist for the rest of [her] life."[2]

Beginning sometime in 1980, McNall complained to Dr. Ruth Rachel Wu, the chairperson of the Department of Nursing at California State University of Los Angeles, that she was experiencing an inability to recall. McNall told Dr. Wu she was unable to remember her material when she was lecturing and was embarrassed because of it. McNall continued to talk with Dr. Wu through 1982, informing her she felt that her memory problem and the ECT treatments were related.

In February 1980, McNall told Charles Foglia, whom she had met in 1974 and had been dating since 1980: " 'Charlie, I've got a big, big problem.' . . . They [have] given me E.C.T." From 1980 through 1984, McNall complained continuously to Foglia about depression, disorientation, and an impaired ability to remember. She told Foglia her memory problems affected her teaching ability and attributed her condition to the ECT treatments and medication.

Following her discharge from the hospital in 1980, McNall complained to Sally Reatha Beatty, her long-time friend and neighbor, about her memory problems. She told Beatty she could not recall parts of her prior marriage or her lecture material.

---

[2] In addition to weekly therapy sessions, Dr. Summers treated McNall with various mood-altering medications. McNall testified that between February and April 1980, she was taking Mellaril, Elavil, Ativan, Ritalin, and Lithium.

On May 1, 1980, McNall met with Dr. Summers at his office for a regularly scheduled therapy session. She told him she was feeling sad and needed someone to care about her. Dr. Summers said he wanted to help her. He picked her up out of her chair, placed her on a sofa, blocked the door to his office with another piece of furniture, removed McNall's and his own clothing, and engaged in sexual intercourse. When he got up, Dr. Summers said: "Oh, my God, half lust and half fear." McNall did not ask him to have sex with her, and Dr. Summers did not tell her that this was a part of her therapy. McNall felt embarrassed and humiliated but believed this occurrence was part of her therapy.

At prior therapy sessions, Dr. Summers had told McNall "[she] should enjoy sex. [She] should not feel guilty about it. That [she] should have sex with as many men as [she] wanted to, and that later on he told [her] not to have sex with other men." Dr. Summers discussed her appearance, her hair, her clothes and asked what it was like for her to have an orgasm as well as the specific details of her sex life.

McNall terminated her therapy with Dr. Summers in July 1982 and resumed treatment with Dr. Hall in November of that year. She told him about the sexual encounter with Dr. Summers. She also informed him about her continuing loss of memory. He apologized for Dr. Summers's conduct, but nothing more. Dr. Hall prescribed medication for her and she continued to see him about every four or five months until the end of 1984.

On October 23, 1985, McNall filed her complaint against Dr. Summers alleging medical malpractice based on sexual abuse.

In November 1986, McNall consulted with a neuropsychologist, who concluded that she had suffered an injury to the left side of her brain implicating the frontal and temporal regions. She was referred to Dr. Jeffrey Cummings, a neurologist. He ordered a magnetic resonance image test (MRI) which revealed a "[p]robable old left frontal cortical infarct." He concluded McNall had suffered an embolic stroke.

On May 22, 1987, McNall filed her first amended complaint alleging an additional cause of action for medical malpractice based on the psychiatric care encompassing the ECT treatments prescribed by Dr. Summers and Doe defendants. On November 30, 1987, Dr. Pitts was substituted as a Doe defendant and was served on December 3, 1987.

In June 1989, Dr. Cummings ordered a single photon emission computerized topography (SPECT) for brain imaging to determine the nature of any

functional injury. The SPECT showed a well-established stroke and Dr. Cummings found that McNall's memory impairment was related to this injury and that the injury had occurred sometime during the ECT treatments.

A bifurcated jury trial was commenced on September 24, 1990. After the parties concluded the introduction of evidence in the first phase of the trial, which was directed to the issue of the statute of limitations, Drs. Summers and Pitts moved for a directed verdict on the ECT claim, claiming it was time-barred, and Dr. Summers moved for nonsuit on the sexual abuse medical malpractice claim. The trial court concluded the ECT claim was barred by the statute of limitations and granted the motion for a directed verdict. The trial court also granted Dr. Summers's motion for nonsuit on the sexual abuse medical malpractice claim finding McNall had failed to prove the sexual abuse was part of her psychiatric treatment.

McNall attacks both rulings contending that: (1) there was sufficient evidence for the jury to find that her claim for injury due to negligent administration of the ECT treatments was timely filed; (2) the court failed to apply the appropriate standard for ruling on a motion for nonsuit; and (3) there was sufficient evidence to support her claim for sexual abuse medical malpractice. McNall raises other collateral contentions on appeal involving evidentiary rulings which we address in the nonpublished portion of this opinion.

### III

### DISCUSSION

### A

### ECT MEDICAL MALPRACTICE

■ An order granting a motion for directed verdict is only permissible when there is no substantial conflict in the evidence. "In ruling on the motion, the court *does not consider credibility of witnesses* but gives to the evidence of the party against whom it is directed *all its legal value*, indulges every legitimate *inference* from such evidence in favor of that party, and *disregards conflicting evidence*." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 409-410, pp. 412-413, italics in original.)

■ Our review of the directed verdict requires analysis and application of Code of Civil Procedure section 340.5, which governs the time limitations

for filing medical malpractice actions.[3] There are two critical independent provisions of that code section: "The first provision states that 'the time for the commencement of action shall be three years after the date of injury . . . .' The second provision creates an alternative limitations period of 'one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury . . . .' Lest it appear, however, that the action is timely if the requirements of only one of these provisions [are] satisfied, the statute further requires that the action be brought within the limitation period which 'occurs first.' To make it even more evident that a plaintiff must satisfy the requirements of both provisions, the statute further provides that '[i]n no event shall the time for commencement of legal action exceed three years. . . .' " (*Hills* v. *Aronsohn* (1984) 152 Cal.App.3d 753, 758 [199 Cal.Rptr. 816].)

*Dolan* v. *Borelli* (1993) 13 Cal.App.4th 816, 825 [16 Cal.Rptr.2d 714], states the operative rule concisely: " 'First, the plaintiff must file within one year after she first "discovers" the injury *and the negligent cause* of that injury. Secondly, she must file within three years after she first experiences harm from the injury. This means that if a plaintiff does not "discover" the negligent cause of her injury until more than three years after she first experiences harm from the injury, she will not be able to bring a malpractice action against the medical practitioner or hospital whose malpractice caused her injury. [Citations.]' " (Italics in original.)

McNall contends that her ECT claim is not barred by the one-year or the three-year provisions of section 340.5, relying on the holding of *Steingart* v. *White* (1988) 198 Cal.App.3d 406 [243 Cal.Rptr. 678].

In *Steingart*, the plaintiff noticed a lump in her breast in 1982. She consulted with Dr. White. He diagnosed the lump as fibrocystic disease (a benign cyst) and advised her not to be concerned. The plaintiff harbored some doubt about this diagnosis and asked Dr. White to order a biopsy. The doctor told her she did not need one. Not satisfied with Dr. White's treatment, she made an appointment with Dr. Oliver three months later. He

---

[3]Code of Civil Procedure section 340.5 provides in pertinent part as follows: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

Hereinafter, unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

ordered a mammogram and confirmed the prior diagnosis. The plaintiff was satisfied with this result until April 1985, when she discovered a change in the contour of her breast. She was referred to another doctor who performed a lumpectomy and advised her she had "Stage II" breast cancer. In March 1986, more than four years after Dr. White's examination, but within one year of the 1985 diagnosis of breast cancer, Steingart filed a medical malpractice action against Dr. White. The trial court granted him summary judgment based on the statute of limitations. The appellate court reversed holding that the three-year limitation of section 340.5 runs from the date of injury, not the date of the negligent act which caused the injury.

Relying upon *Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 655-656 [135 Cal.Rptr. 75, 557 P.2d 507], the *Steingart* court held that "injury" is the predicate word and that it refers to an event which follows the negligent act—the suffering of appreciable harm. (*Steingart* v. *White, supra,* 198 Cal.App.3d at pp. 413-414.) Thus, the three-year period is tolled until the plaintiff suffers appreciable harm or the point in time at which appreciable harm is first manifested. These are not alternative events but simply two ways of describing the phenomenon of "injury" within the meaning of section 340.5. (*Larcher* v. *Wanless, supra,* 18 Cal.3d at p. 656, fn. 11; *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 437, fn. 8 [186 Cal.Rptr. 228, 651 P.2d 815]; *Bispo* v. *Burton* (1978) 82 Cal.App.3d 824, 831 [147 Cal.Rptr. 442].) Because the plaintiff had been repeatedly told that the lump in her breast was nonthreatening, the *Steingart* court rejected the doctor's argument that the plaintiff had been injured in 1982 when she became aware of the lump in her breast. (*Steingart* v. *White, supra,* 198 Cal.App.3d at pp. 414-415.) Instead, it concluded that the plaintiff had "suffered no damaging affect [*sic*] or appreciable harm" until her cancer was diagnosed in April 1985. (*Id.* at p. 414.)

In its analysis, the *Steingart* court distinguished *Hills* v. *Aronsohn, supra,* 152 Cal.App.3d 753, the authority on which Drs. Summers and Pitts rely. In *Hills,* the plaintiff received intrabreast silicone injections in 1966. In 1974, she found lumps and experienced soreness in her breasts. That same year, she consulted a physician, who diagnosed her condition as silicone grantulomatosis due to silicone injections and recommended surgery. In 1977, she underwent bilateral subcutaneous mastectomy and breast reconstruction. Hills filed suit in March 1978 against the doctor who had administered the silicone injections in 1966. In holding that the statute of limitations was triggered in 1974, the court concluded: "[S]he experienced soreness and noticed lumps in her breasts in March of 1974, four years before filing suit [which] caused her to consult [her physician] . . . . This admission is sufficient to show that she suffered the damaging effect of the alleged malpractice [in 1974]." (152 Cal.App.3d at p. 762.) The *Steingart* court held

the plaintiff's awareness of the lump in her breast was not a "clear indication of injury, either damaging effect or appreciable harm." (*Steingart* v. *White, supra,* 198 Cal.App.3d at p. 415.) Unlike *Hills,* Steingart was not on notice that her lump was the result of any earlier treatment. On the contrary, she was told repeatedly the lump was nonthreatening. (*Steingart* v. *White, supra,* 198 Cal.App.3d 415.) Essentially, the court concluded Steingart's injury was a hidden injury and there was nothing more she could have done to discover it.

Although McNall acknowledges her long-term awareness of her memory loss and its correlation to the ECT treatments, she argues that *Steingart* is controlling because she was totally unaware she sustained a stroke until it was diagnosed by Dr. Cummings in November 1986. She argues that her functional memory problems were no more an indication of brain damage than Steingart's palpable lump was an indication of cancer.

McNall contends that she could not have discovered that she suffered an embolic stroke or that it was caused by ECT until it was medically diagnosed. To reinforce her contention, she refers to Dr. Summers's assurances that her memory impairment would last for only a period of months, was a normal characteristic side effect of ECT treatment, and, finally, was due to her peculiar type of depression. These assurances, she claims, are comparable to the assurances given to Steingart by the doctors who misdiagnosed her cancer as being benign.

We cannot compare McNall's loss of memory with Steingart's discovery of breast cancer. McNall unequivocally experienced losses of memory commencing with the ECT treatments in 1979. Memory loss is a functional deficit generally indicating an organic injury or serious psychosis. Here, not only did McNall's onset of complaints immediately follow the ECT, but both she and her physician associated the symptom with that specific treatment. There was nothing hidden about her injury. McNall fully recognized she was continuously experiencing harmful lapses in memory adversely affecting her professional and personal life. It is simply uncontroverted that McNall knew she was damaged in some way by the ECT treatments. That is sufficient to trigger the three-year period provided for in section 340.5.

McNall's early complaints in 1980 to Foglia, Beatty, and Dr. Wu fully demonstrate McNall was aware she had experienced manifest injury and appreciable harm which she directly associated with her ECT treatments. By her own testimony, she "had reason to believe in March of 1984 and before March of 1984 that in fact E.C.T. had caused [her] memory problems." Her

persistent complaints to a rather large audience and her professional experiences as a registered nurse and nursing instructor cast doubt on her contention that she did not and could not reasonably be aware of the fact she was damaged—injured—by the ECT treatments until Dr. Cummings gave his diagnosis in November 1986. "[D]amage is 'manifested' for purposes of commencing the three-year period when it has become evidenced in some significant fashion . . . . We accept the *Steingart* proposition that severe damage which does not show itself (hidden cancer, for instance) is not 'injury' until it is found by diagnosis. It does not follow, however, that damage which has clearly surfaced and is noticeable is not 'injury' until either the plaintiff or her physician recognizes it." (*Marriage & Family Center* v. *Superior Court* (1991) 228 Cal.App.3d 1647, 1654 [279 Cal.Rptr. 475].)

 McNall's serious and continuous loss of memory constitutes "injury" for the purpose of triggering the three-year period even if McNall did not, or arguably could not, discover the actual organic injury causing the loss of memory or discern the negligent conduct of her doctors.

At a minimum, McNall was aware of her "injury" no later than March 1980, when she concluded the 26 ECT treatments. "The three-year period, however, commences simply upon the 'date of injury.' . . . [N]othing beyond the mere existence of the 'injury' is to be required is emphasized by the statement that the three-year period may be extended only by three specific exceptions, none of which relates to the plaintiff's discovery of her condition (absent fraud or concealment by the defendant)." (*Marriage & Family Center* v. *Superior Court, supra*, 228 Cal.App.3d at p. 1654.)[4] It is clear that McNall was required to file suit by March 1983, thus making her October 23, 1985, filing untimely.

Furthermore, the statutory tolling provisions of fraud and intentional concealment were neither pleaded nor proven and provide no relief to McNall. Although McNall associated the insult to her head (ECT) and the immediate onset of her functional disability (loss of memory), she contends she failed to pursue any inquiry because of Dr. Summers's assurances. There is no evidence that Dr. Summers had any knowledge or information contrary to what he told her or concealed any information from her. The relevant provisions for extending the three-year time bar require "affirmative acts by the health care provider rather than mere omission or exercise of

---

[4]The trial court granted the directed verdict on the ground that the time bar runs from the date of the act causing injury. As our analysis reveals, that is erroneous. However, a correct ruling is not reversible simply because the court's reasoning is wrong. (*Mayflower Ins. Co.* v. *Pellegrino* (1989) 212 Cal.App.3d 1326, 1332 [261 Cal.Rptr. 224].)

poor judgment." (*Wallace* v. *Hibner* (1985) 171 Cal.App.3d 1042, 1050 [7 Cal.Rptr. 748].) There is no general nonstatutory tolling of the three-year period based on the continuation of the doctor-patient relationship. That fact may only be relevant when fraud and intentional concealment are at issue. (See *Brown* v. *Bleiberg, supra,* 32 Cal.3d 426, 438, fn. 9.)[5]

Relying upon the fact that in November 1986 Dr. Cummings administered an MRI and found she had suffered a stroke, McNall urges that her May 1987 filing alleging the ECT claim was timely because it met the statutory requirement that the action be commenced within one year of reasonable discovery of the injury and its negligent cause. There is no need to examine the merits of this argument because McNall's failure to file her action within three years of the manifestation of appreciable harm overrides the one-year requirement and precludes her lawsuit.

In sum, the filing of the complaint on October 23, 1985, was well beyond the three-year provision of section 340.5. Thus, we affirm the trial court's ruling on the motion for directed verdict.

B

SEXUAL ABUSE MEDICAL MALPRACTICE

 Dr. Summers moved for nonsuit of the sexual abuse medical malpractice claim on the ground that McNall failed to produce any evidence that Dr. Summers engaged in sexual relations with her under the guise of rendering professional services. He relied on *Atienza* v. *Taub* (1987) 194 Cal.App.3d 388 [239 Cal.Rptr. 454], contending that because Dr. Summers did not inform McNall that the sexual act was a part of her therapy she could not prove her case.

*Atienza* is quite distinguishable on its facts. There, the plaintiff consulted a physician for treatment of phlebitis. She alleged that during the course of her treatment the doctor " 'seduced [her] into having sexual relations and an affair with her which lasted [for one year].' Both his treatment of [her] for her medical condition and his affair with her ended [at the same time]." (*Atienza* v. *Taub, supra,* 194 Cal.App.3d at p. 390.) The court found the plaintiff combined the care she was given for her phlebitis with the "emotionally destructive effect" of her "romantic and sexual involvement with [the doctor] under the rubric of 'treatment' simply because the two things

---

[5]Even if the three-year time bar did not commence until the doctor-patient relationship terminated in July 1982, this would not save McNall's ECT claim because her complaint was filed several months too late.

took place over the same period of time." (*Id.* at pp. 392-394.) In affirming a dismissal of the plaintiff's complaint, the court stated the operative rule for claims of medical malpractice based on sexual abuse: "a physician who induces a patient to enter into sexual relations is liable for professional negligence only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician." (194 Cal.App.3d at p. 393.)

In this case, the trial court applied *Atienza* too narrowly by construing the term "pretext" to mean the doctor must directly inform the patient that the sexual conduct is a part of her therapy.[6] "Pretext" refers to all the surrounding circumstances that would lead a reasonable person, given his or her peculiar situation, to interpret the doctor's conduct to be a part of the treatment for the patient's particular injury or illness. Here, the patient had serious emotional distress and was seeking therapy for her psychological problems. Therefore, the conduct of her psychiatrist must be viewed through the prism applicable to health care providers specializing in psychotherapy.

In *Atienza*, we commented on this specific issue: "[There is a] greater propensity [for] psychiatric patients to develop strong emotional dependence upon their physicians in what is called the transference phenomenon and, correspondingly, the greater possibility for emotional exploitation of the patient. [Citation]." (*Atienza* v. *Taub, supra,* 194 Cal.App.3d at p. 393, fn. 2.)

Although the specialty of the doctor is not necessarily controlling to the determination of whether the sexual conduct occurred in the scope of treatment, there is substantial authority that patients of mental health professionals are more dependent and are more subject to emotional exploitation. Each case will turn on its own facts and the circumstances will vary from crass representations that this "will be good for you," as in *Mason* v. *Marriage & Family Center* (1991) 228 Cal.App.3d 537, 540 [279 Cal.Rptr. 51], to the callous exploitation of an economically deprived and sexually abused woman, as in *Simmons* v. *United States* (9th Cir. 1986) 805 F.2d 1363, 1364.

The "pretext" here was the improper use of transference therapy.[7] McNall produced Dr. Maria Lymberis, a clinical psychologist, who testified that

---

[6] The trial judge commented: "The necessary element is that the doctor said something, according to this [*Atienza* case], told her something, told her that this was part of her psychiatric treatment and, because of that, induced her through the promise that this was part of her psychiatric treatment, into having sex with him."

[7] "Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is 'generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past.' [Citation.] Transference 'is perhaps regarded as the most significant concept in

McNall did not consent to sexual intercourse with Dr. Summers. In her professional opinion, Dr. Summers had mishandled the therapy of transference. In the view of Dr. Lymberis, McNall formed an intense regressive sexualized transference to Dr. Summers and was, therefore, vulnerable. She explained, "When an adult person has sexual feelings towards the doctor, and the doctor is experiencing a transference as the parent, these sexual feelings in the patient are terrifying and anxiety-producing because they are incestuous. [¶] In other words, the person symbolically experiences the doctor as a parent and experiences the sexual feelings towards the doctor as incest, symbolically." She further testified McNall's emotional injuries of confusion, anxiety, and guilt were compounded by the sexual act in May 1980.

In essence, Dr. Lymberis's explication emphasized the development of a dependent and controlling relationship in which the psychiatrist assumed a role in the mind of the patient other than one of physician. She opined that Dr. Summers's discussions with McNall regarding her appearance and sexual activity were misapplications of the psychoanalytical therapy of transference, as was the act of sexual intercourse. In Dr. Lymberis's opinion, McNall did not "consent" to sexual intercourse with Dr. Summers but acted under the compulsion of regressive sexual transference resulting from Dr. Summers's mishandling of her therapy. This expert testimony obviously complemented McNall's testimony that, even though she knew it was improper for a therapist to have sex with a patient, she believed having sexual intercourse with Dr. Summers was part of her treatment. It was sufficient to support the sexual abuse medical malpractice claim if a jury found the testimony credible.

██ "Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. [Citation.] A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. [Citations.] [¶] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . ." ' " (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656].) ██ Here, the trial court used the wrong standard in granting the nonsuit. It failed to draw every inference in favor of McNall and

---

psychoanalytical therapy, and one of the most important discoveries of Freud.' [Citations.]" (*Simmons* v. *United States, supra,* 805 F.2d at p. 1364.)

improperly considered and determined the credibility of McNall's expert witness.[8]

In his brief, Dr. Summers contends that even if the nonsuit was improvidently made, the sexual abuse medical malpractice claim may be disposed of on the alternative ground that it is time-barred by section 340.5. This same proposal was made to the trial court. The court concluded the claim was disposed of by the nonsuit and there was no action to which any time limitation would apply. Dr. Summers's counsel acceded to the trial court's observation and allowed that the issue "would appear moot." Consequently, the parties never formally addressed the claim and the court made no ruling on it. It would therefore be improper for this court to pursue the matter any further.

## IV

### COLLATERAL EVIDENTIARY ISSUES*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We affirm the directed verdict, reverse the nonsuit, and remand to the trial court for a new trial on the sexual abuse malpractice claim only. The parties shall bear their own costs on appeal.

Woods (A. M.), P. J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 7, 1994.

---

[8]When McNall's counsel attempted to argue that his client did not consent to sexual intercourse with Dr. Summers based on Dr. Lymberis's testimony, the judge stated: "Well, I also have the right to test the credibility of the witnesses. And if you believe everything Dr. Lymberis says, then you and I will never see eye to eye. [¶] Dr. Lymberis said that women do not like orgasm because it's the same to them as electroshock therapy. And, still, when I go home and I am listening to the radio and I get Dr. Toni Grant or some of these on, there are women calling in all the time wondering how they can achieve orgasm. [¶] And here's a woman who says that women do not want it because it's just the most horrible that they could possibly have next to electroshock therapy." This characterization of the testimony reveals the trial court did not believe Dr. Lymberis and, based on his assessment of her credibility, granted the motion for nonsuit. Not only is the issue of credibility not within the standard for determining motions for nonsuit, but the court's use of out-of-court statements in making that determination was absolutely erroneous.

*See footnote, *ante*, page 1300.