[No. B096771. Second Dist., Div. Three. Sept. 23, 1997.]

JANET WARREN, Plaintiff and Respondent, v.
LAWRENCE SCHECTER, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, Ellis J. Horvitz, S. Thomas Todd, Lisa Perrochet, Elliot, Lamb, Leibl & Snyder and Loren Leibl for Defendant and Appellant.

Esner, Higa & Chang, Stuart B. Esner, Andrew N. Chang, Rowell & Tessier and John Rowell for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Lawrence Schecter, M.D. (Dr. Schecter) appeals a judgment in favor of plaintiff and respondent Janet Warren (Warren) following a jury trial of a medical malpractice action arising out of a failure to obtain informed consent to surgery.

The issues presented include Warren's entitlement to calendar preference on appeal, whether her action against Dr. Schecter was time-barred, and the damages recoverable for the failure to obtain informed consent.

We conclude, inter alia: Warren's medical condition entitles her to calendar preference on appeal (see Code Civ. Proc., § 36; Cal. Rules of Court, rule 19.3); Warren's action which was filed within one year of the manifestation of the *undisclosed* complication of bone disease was timely (Code Civ. Proc., § 340.5; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 240-241 [104 Cal.Rptr. 505, 502 P.2d 1]); the trial court properly instructed the jury Warren was required to prove a *reasonably prudent person in her position* would have refused the surgery if adequately informed of the perils (*Cobbs, supra*, at p. 245; BAJI No. 6.11 (8th ed. 1994)); and Warren is entitled to compensation for all damages proximately resulting from Dr. Schecter's failure to give full disclosure of the risks of surgery (Civ. Code, § 3333; *Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 418 [175 Cal.Rptr. 365]; *Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 803 [82 Cal.Rptr. 67]). Warren is entitled to recover not only for the undisclosed complications, but also for the disclosed complications, because she would not have consented to either surgery had the true risk been disclosed, and therefore would not have suffered either category of complications.

The judgment therefore is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *Facts.*

Warren, who is now 47 years of age, began experiencing stomach problems in 1980 or 1981. In December 1981, she was diagnosed as having a stomach ulcer. Warren initially was treated by Dr. Feldman, who referred her to Dr. Schecter, a surgeon. Dr. Schecter sought to perform surgery to remove the portions of the stomach containing the ulcer, which was not healing completely.

One of the well-known significant risks of gastric surgery is decreased calcium absorption, leading to early and severe metabolic bone disease (osteoporosis, osteomalacia or bone pain). Studies have reported that up to 38 percent of patients develop early severe osteoporosis following such surgery. It was Dr. Schecter's role as the surgeon to advise Warren of the

---

[1]In accordance with the usual rule, the evidence is set forth in the light most favorable to the judgment. (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043].)

risks of surgery in order to obtain her informed consent. Dr. Schecter did not believe osteoporosis, osteomalacia and bone pain were risks of the surgery and he did not discuss those substantial risks with her.

Dr. Schecter did advise Warren she might experience bowel obstructions. Dr. Schecter also informed Warren of other risks, including "dumping syndrome," involving nausea, and the slight risk of death from the administering of anesthesia during any operation. Based on the limited risks disclosed to Warren, she consented to the surgery, which Dr. Schecter performed on September 10, 1982.

Had Dr. Schecter warned Warren of the risk of metabolic bone disease, she would not have consented to said surgery. The surgery recommended by Dr. Schecter was elective. Warren had nonsurgical options for her ulcers, namely, to discontinue the use of Advil and aspirin, to cease smoking, and to continue with her ulcer medications.

Following the surgery, Warren developed "dumping syndrome," a side effect which occurs in about 1 percent of the patients who undergo this procedure. Warren also developed "alkaline reflux gastritis," a condition involving the movement of alkaline fluid back into the stomach. After Warren was diagnosed with these complications, in 1985, she returned to Dr. Schecter, who recommended surgery. The purpose of the second surgery was to relieve the pain and discomfort from the first surgery. The second surgery would enhance the risk of bone disease. However, Dr. Schecter again failed to advise Warren of the risk of metabolic bone disease. Warren would not have consented to the second surgery either had she been duly advised of the risk. Dr. Schecter performed the second surgery on June 11, 1985.

The first manifestation of bone disease occurred on May 4, 1990, when Warren fractured her back from the mere act of turning over in bed. Until then, there had been no objective evidence of bone disease and no symptoms. Warren was taken to emergency at University of California Los Angeles Hospital (UCLA), where she was advised she had suffered a fracture of one of the lumbar vertebrae. At that time, she first learned severe metabolic bone disease was a common side effect of the surgeries she had undergone. Dr. Saleh at UCLA advised Warren the surgeries had caused the osteoporosis which had led to the fracture. A bone density scan confirmed Warren's bones were soft, brittle and very breakable, and that she had lost a lot of bone mass.

Since the onset of bone disease, Warren's condition has continued to deteriorate. Her bones are so brittle she can break them simply by getting up

or reaching for a door. Since 1992, Warren has been fed a special diet through a tube to her intestines.

## 2. *Proceedings.*

In January 1991, Warren filed this action for medical negligence, alleging Dr. Schecter is liable under an informed consent theory for performing surgery without advising her of the risk of bone disease.[2] Warren also sued Dr. Feldman, who settled on the eve of trial for $29,999.99.

The action was bifurcated. The first phase involved the statute of limitations defense. The jury returned a special verdict finding Warren timely filed this action for professional negligence against Dr. Schecter "within three years after the date of her injury" and "within one year after she discovered, or through the use of reasonable diligence should have discovered, her injury and the negligent cause of that injury."

The second phase of the trial concerned the issues of liability and damages. The jury found on special verdict (1) Dr. Schecter did not disclose to Warren all relevant information which would enable her to make an informed decision regarding surgery, (2) a reasonably prudent person in Warren's position would not have consented to surgery if adequately informed of all the significant perils, and (3) Dr. Schecter's negligence was a cause of injury to Warren.

The jury awarded damages to Warren as follows: $140,840 in past medical care; $6,001,135 in present cash value for her future medical care; $262,562 in past loss of earnings; and $572,376 in present cash value for lost future earnings.[3] The jury apportioned 25 percent comparative fault to Warren. Finally, with respect to the total amount of Warren's damages caused by Dr. Schecter's negligence, the jury apportioned 65 percent to metabolic bone disease, osteoporosis or osteomalacia, and 35 percent to other complications.

On September 14, 1995, judgment was entered requiring a lump sum payment of $1,824,285 and periodic payments for future care totaling $9.6 million over 34 years. On October 31, 1995, the trial court denied Dr.

---

[2] Where a patient consents to certain treatment and the physician performs the treatment without meeting the due care duty to disclose pertinent information, the cause of action is negligence, not battery. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 240-241.) The battery theory is reserved "for those circumstances when a doctor performs an operation to which the patient has not consented." (*Id.,* at p. 240.)

[3] At Warren's request, the jury did not award any damages for pain and suffering.

Schecter's motions for new trial and for judgment notwithstanding the verdict. Dr. Schecter filed a timely notice of appeal from the judgment.[4]

## CONTENTIONS

Dr. Schecter contends: The action is time-barred because it was filed more than three years after Warren admits she suffered serious medical complications as a result of his alleged negligence; the statute of limitations began to run no later than the date Warren became aware she had suffered postsurgical complications and that Dr. Schecter had failed to disclose a material risk of surgery; the judgment improperly includes damages for risks to which Warren consented and for which any claim is time-barred; the verdict is the result of an erroneous informed consent instruction that omitted a required element of causation; and the jury's finding Dr. Schecter acted negligently is tainted by evidentiary and instructional errors.[5]

## DISCUSSION

1. *Warren's medical condition warrants calendar preference on appeal.*

■ As a threshold matter, we discuss the issue of calendar preference on appeal.

During the briefing stage, Warren filed an unopposed motion seeking calendar preference. The moving papers stated that due to the filing of the appeal and the posting of an appeal bond by Dr. Schecter, Warren was unable to rely on the judgment to pay any portion of her medical care costs. Warren had sold that portion of the judgment which she could, at a 50 percent discount, but the $250,000 in proceeds already had been depleted. Over a six-month period, just the cost of supplying Warren with the nutritional formula she requires was nearly $35,000. The supporting declaration of a treating physician opined that without the funds for proper medical care, Warren probably would die within six months.

By way of background, various provisions expressly authorize *appellate* calendar preference in certain types of actions. The civil proceedings entitled to preference on appeal include probate proceedings (Code Civ. Proc., § 44), juvenile matters (Cal. Rules of Court, rule 39(e)), and contested election proceedings (Code Civ. Proc., § 44). Also, California Rules of Court, rule

---

[4]Warren filed a notice of cross-appeal but later dismissed it, leaving Dr. Schecter as the sole appellant.

[5]In the opening brief, Dr. Schecter also contends the judgment should be modified to reflect the amount of Warren's settlement with Dr. Feldman. In the reply brief, however, the contention is withdrawn.

19.3 provides: "A motion for preference on the calendar, supported by points and authorities, shall be filed no later than the last day for filing the appellant's reply brief."

The circumstances of this case fit most closely within Code of Civil Procedure section 36, dealing with *trial* setting preference, which provides, inter alia, for preference where a party suffers from an illness or condition raising "substantial medical doubt of survival" beyond six months (Code Civ. Proc., § 36, subd. (d)), or where a party is over age 70, has a "substantial interest in the action as a whole" and whose health "is such that preference is necessary to prevent prejudicing his or her interest in the litigation." (Code Civ. Proc., § 36, subd. (a).) Presumably, the remedial provision of Code of Civil Procedure section 36 is a legislative recognition of the maxim that "justice delayed is justice denied." (*Laborers' Internat. Union of North America* v. *El Dorado Landscape Co.* (1989) 208 Cal.App.3d 993, 1007 [256 Cal.Rptr. 632].)

However, as noted in an appellate practice guide, Code of Civil Procedure section 36 does not speak *to calendar preference on appeal*, only to *trial setting* preference. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs 1 (The Rutter Group 1996) ¶ 5:205, p. 5-51.) Nevertheless, the statute's rationale for granting calendar preference to certain litigants is equally applicable to appellate proceedings.

"It is beyond dispute that 'Courts have inherent power, as well as power under section 187 of the Code of Civil Procedure, [fn. omitted] to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.' [Citation.]" (*Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 812-813 [31 Cal.Rptr. 316, 382 P.2d 356]; accord, *Western Steel & Ship Repair, Inc.* v. *RMI, Inc.* (1986) 176 Cal.App.3d 1108, 1116 [222 Cal.Rptr. 556]; *Topa Ins. Co.* v. *Fireman's Fund Ins. Companies* (1995) 39 Cal.App.4th 1331, 1344 [46 Cal.Rptr.2d 516].) In view of this court's inherent power to control its own proceedings, as well as pursuant to California Rules of Court, rule 19.3, we have discretion to grant a motion for calendar preference upon an appropriate showing. Clearly, the interests of justice dictate that a litigant who may not survive the delay of an appellate court backlog be afforded calendar preference. Consequently, we granted Warren's motion for preference.

Nonetheless, to deal with what is a recurring issue and to formalize what is already the practice, "[w]e suggest that the Judicial Council amend the California Rules of Court to make explicit that which is currently only

implicit" (*People* v. *Dupuis* (1992) 7 Cal.App.4th 696, 701, fn. 4 [8 Cal.Rptr.2d 923]), in this case, to provide expressly for appellate calendar preference for ailing or elderly litigants.[6]

We turn now to the merits of the appeal.

2. *General principles.*

a. *Informed consent.*

■ The "doctrine of informed consent recognized in *Cobbs* v. *Grant*, *supra*, 8 Cal.3d 229, was imposed 'so that patients might meaningfully exercise their right to make decisions about their own bodies.' [Citation.]" (*Arato* v. *Avedon* (1993) 5 Cal.4th 1172, 1183 [23 Cal.Rptr.2d 131, 858 P.2d 598].)

As discussed in *Arato* v. *Avedon, supra*, 5 Cal.4th at page 1183, "[i]n *Cobbs* v. *Grant*, [the Supreme Court] not only anchored much of the doctrine of informed consent in a theory of negligence liability, but also laid down four 'postulates' as the foundation on which the physician's duty of disclosure rests. [¶] 'The first [of these postulates,]' [*Cobbs*] wrote, 'is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment.' [Citation.] [¶] 'The third [postulate,]' [*Cobbs*] continued, 'is that the patient's consent to treatment, to be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in [the] physician for the information upon which [the patient] relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions.' [Citation.] From these ethical imperatives, [*Cobbs*] derived the obligation of a treating physician 'of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.' [Citation.]" (*Arato, supra*, 5 Cal.4th at p. 1183.)

b. *The applicable statute of limitations.*

■ Code of Civil Procedure section 340.5 provides the time for commencing an action for injury based on alleged professional negligence by a

---

[6]The Judicial Council is empowered to "adopt rules for court administration, practice and procedure, . . . not . . . inconsistent with statute." (Cal. Const., art. VI, § 6; accord, *California Court Reporters Assn.* v. *Judicial Council of California* (1995) 39 Cal.App.4th 15, 21-22 [46 Cal.Rptr.2d 44].)

health care provider "shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, *whichever [time period expires] first.*" (Italics added.)

Damage is " 'manifested' for purposes of commencing the three-year period when it has become evidenced in some significant fashion." (*Marriage & Family Center* v. *Superior Court* (1991) 228 Cal.App.3d 1647, 1654 [279 Cal.Rptr. 475].) A plaintiff must file suit within three years of "experienc[ing] harm from the injury." (*Dolan* v. *Borelli* (1993) 13 Cal.App.4th 816, 825 [16 Cal.Rptr.2d 714]; accord, *McNall* v. *Summers* (1994) 25 Cal.App.4th 1300, 1308 [30 Cal.Rptr.2d 914]; see generally, 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 536, pp. 676-677.)

The three-year period is tolled "(1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person." (Code Civ. Proc., § 340.5.)

The "one-year period is not similarly extended." (*Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 896 [218 Cal.Rptr. 313, 705 P.2d 886].) Thus, "once a patient knows, or by reasonable diligence should have known, that [she] has been harmed through professional negligence, [she] has one year to bring [her] suit." (*Ibid.*) The patient "is charged with 'presumptive' knowledge of [her] negligent injury, and the statute commences to run, once [she] has ' "notice or information of circumstances to put a reasonable person *on inquiry,* or *has the opportunity to obtain knowledge* from sources open to [her] investigation . . . ." ' [Citations.] Thus, when the patient's 'reasonably founded suspicions [have been aroused],' and she has actually 'become alerted to the necessity for investigation and pursuit of her remedies,' the one-year period for suit begins." (*Id., at* pp. 896-897.)

3. *No merit to Dr. Schecter's contention the action is time-barred on the ground it was filed more than three years after Warren suffered serious medical complications.*

█ Dr. Schecter contends the action is time-barred because it was filed more than three years after Warren admits she suffered serious medical complications as a result of Dr. Schecter's alleged negligence. Dr. Schecter argues: "it is undisputed that significant adverse complications from surgery were manifest more than three years before [Warren] filed suit. . . . No other facts regarding what [Warren] knew or should have known about her condition are relevant. The action is time-barred."

Dr. Schecter's contention Warren's cause of action accrued upon the occurrence of the disclosed complications, such as dumping syndrome, is meritless. Under Dr. Schecter's theory, by the time the undisclosed complication of bone disease materialized, the time to bring suit for failing to disclose this risk already had expired. However, an action for failure to obtain informed consent lies where "an *undisclosed* inherent complication . . . occurs" (*Cobbs* v. *Grant, supra*, 8 Cal.3d at pp. 240-241, italics added), not where a disclosed complication occurs. The complications which did occur more than three years before Warren filed suit, such as the dumping syndrome, were complications of which she previously had been warned. Therefore, the appearance of those complications did not give rise to a cause of action for failure to obtain informed consent.

4. *No merit to Dr. Schecter's alternative contention as to why the action is time-barred.*

Next, Dr. Schecter contends even assuming the statute of limitations did not begin to run on the date Warren suffered any complications of surgery (whether or not the risk was disclosed before surgery), then the statute began to run no later than the date Warren suffered such complications and learned, or was on notice of, another risk that was not disclosed. Here, Warren was aware of the postoperative dumping syndrome and other problems more than three years before filing suit. Further, in late 1985 or early 1986, Warren had a discussion with Dr. Feldman in which he told her that her diet was low in calcium and that she ought to take calcium supplements.[7]

Based thereon, Dr. Schecter argues by late 1985 or early 1986, Warren had suffered appreciable injury and had information that gave her reason to believe Dr. Schecter had not told her all the risks of surgery.

The argument is without merit. The jury reasonably could conclude Warren's mere knowledge of the need to take calcium did not constitute appreciable harm and did not put her on notice Dr. Schecter had failed to disclose metabolic bone disease was a risk of the surgeries.

Dr. Schecter further asserts the trial court prevented him from presenting a valid statute of limitations defense based on the earlier complications Warren suffered and her prior notice of the risk about which she had not been informed.

The contention likewise fails. The trial court gave instructions to the jury which left to the jury's determination when injury first was manifested.

---

[7]Warren testified Dr. Feldman told her she "may possibly need to take calcium at some point in time."

Specifically, the trial court instructed the jury: "The plaintiff has alleged as the injury osteoporosis, osteomalacia, and metabolic bone disease. The three-year statute starts from the date of the injury. The injury occurs at that point at which appreciable harm was first manifested. '*Manifested*' is that point at which the damage has become evidenced in some significant fashion; when the damage has clearly surfaced and is noticeable. This is true whether or not the plaintiff/patient actually becomes aware of the injury." (Italics added.)

According to Dr. Schecter, the injury was manifested when Warren was told in the mid-1980's she had a calcium deficiency. Warren's position is that the injury from the failure to disclose the risk of metabolic bone disease was not manifested until 1990, when she broke her back. The jury reasonably found Warren's position more persuasive.

5. *No merit to Dr. Schecter's contention Warren cannot recover damages for complications which were disclosed to her.*

■ Dr. Schecter argues even if Warren's entire action is not time-barred, at least the 35 percent of damages the jury attributed to postsurgery complications other than bone disease should be stricken from the judgment. Dr. Schecter reasons that because Warren was informed of, and consented to, the risk she would experience these complications, she should not collect damages for them. In other words, "the *non*-bone disease damages could *not* be 'injuries' resulting from the lack of informed consent."

The argument is unpersuasive. Civil Code section 3333 states: "For the breach of an obligation not arising from contract, the measure of damages . . . , is the amount which will compensate *for all the detriment proximately caused thereby*, whether it could have been anticipated or not." Here, the evidence established *Warren would not have consented to either operation* if the risk of bone disease had been disclosed, and therefore she would not have suffered even the disclosed surgical complications. Accordingly, the inadequate advisement entitles Warren to recover damages for all postsurgery complications, including the complications of which she had been informed.

Case law provides further support for Warren's position. *Willard* v. *Hagemeister*, *supra*, 121 Cal.App.3d at page 418, which reversed a grant of summary judgment on the issue of informed consent, found a "question of fact [as to] whether [dentists] Hagemeister and Hardin gave [patient] Willard 'sufficient information' as to the nature of the root canal and crowning, and the imminent possibility of extraction, so that she could intelligently decide

whether to undergo the dental procedure. If Hagemeister and Hardin did not make this minimal disclosure of material facts, they are liable *for all injuries* sustained by Willard during the course of this dental treatment, *whether the treatment was negligent or not.* [Citation.]" (Italics added.)

Similarly, *Berkey v. Anderson, supra,* 1 Cal.App.3d at page 803, states that "[i]f appellant did not give his informed or knowledgeable consent, . . . the defendant would be liable *for all damages proximately resulting,* whether [the procedure] was or was not skillfully performed [citation] and whether [the damages] could be anticipated or not [citation]." (Italics added.)

By a parity of reasoning, Warren is entitled to compensation for all damages proximately resulting from Dr. Schecter's failure to give full disclosure of the risks of surgery. Warren is entitled to recover not only for the undisclosed complications but also for the disclosed complications, because she would not have consented to any surgery had the true risk been disclosed, and therefore would not have suffered those complications either.

Resorting to a statute of limitations argument, Dr. Schecter argues that even if the dumping syndrome and other complications were proximately caused by the failure to obtain informed consent, Warren's claim to recover for those injuries is barred by the three-year statute of limitations and cannot be revived by the much later manifestation of bone disease. Therefore, the judgment must be reduced by the 35 percent attributed by the jury to non-bone-disease complications.

The argument is unpersuasive. The issue of the *accrual of a cause of action* for breach of the duty to disclose is entirely *separate* from the issue of the scope of *recoverable damages* for a physician's negligent failure to disclose pertinent risks. The disclosed risks only became compensable upon the accrual of Warren's cause of action for negligence based on the lack of informed consent. Before Warren broke her back in 1990, at which time an undisclosed risk materialized, she had not suffered a *legally compensable injury* and therefore did not yet have a cause of action for negligence based on the lack of informed consent.

As stated in *Hills v. Aronsohn* (1984) 152 Cal.App.3d 753, 762, footnote 7 [199 Cal.Rptr. 816], "[i]n a medical malpractice action, where an element of the cause of action is damages, a cause of action cannot accrue until the plaintiff has suffered some legally compensable injury." This is consistent with the general rule that "[i]f the allegedly negligent professional conduct does not cause damage, it generates no cause of action in tort. The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice

to create a cause of action for negligence." (*Van Dyke* v. *Dunker & Aced* (1996) 46 Cal.App.4th 446, 452 [53 Cal.Rptr.2d 862].)

Thus, Warren could not sue for the occurrence of the disclosed risks, such as dumping syndrome, prior to May 1990, when the undisclosed risks materialized and the cause of action for failure to disclose accrued. Accordingly, we reject Dr. Schecter's contention Warren's action to recover for the disclosed risks was untimely.

6. *No merit to Dr. Schecter's contention the informed consent instruction was erroneous.*

Pursuant to BAJI No. 6.11, the trial court instructed the jury in relevant part: "Even though the patient has consented to a proposed treatment or operation, the failure of the physician to inform the patient . . . before obtaining such consent is negligence and renders the physician subject to liability for any injury caused by the treatment [or] operation *if a reasonably prudent person in the patient's position* would not have consented to the treatment [or] operation if he or she had been adequately informed of all the significant perils." (Italics added.)[8]

Dr. Schecter contends this instruction was erroneous because it "failed to inform the jury that plaintiff *also* must prove under a *subjective* standard that *she* would have refused surgery absent the physician's negligence." The contention is meritless. As explained below, the given instruction correctly advised the jury Warren was required to meet an objective standard, i.e., that a reasonable person in Warren's position would have refused the surgery if adequately informed of the perils.

In *Cobbs* v. *Grant, supra,* 8 Cal.3d at page 245, the Supreme Court adopted an objective test, requiring the plaintiff to prove a prudent person in the plaintiff's position would not have consented to the surgery if adequately informed of the risk. *Cobbs* states: "There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given. . . . [¶] The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice

---

[8]We observe said BAJI instruction, including the language in issue, is quoted without criticism in *Arato,* v. *Avedon, supra,* 5 Cal.4th at page 1180, footnote 3.

will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. *Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils.* [Citation.]" (*Ibid.*, italics added.)

In *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902], the Supreme Court further explained: "The prudent person test for causation was established to protect defendant physicians from the unfairness of having a jury consider the issue of proximate cause with the benefit of the '20/20 vision of hindsight . . . .' (*Cobbs, supra,* 8 Cal.3d at p. 245.) This standard should not be employed to prevent a physician *from raising the defense* that even given adequate disclosure the injured patient would have made the same decision, regardless of whether a reasonably prudent person would have decided differently if adequately informed." (*Truman, supra,* 27 Cal.3d at p. 295, fn. 5, italics added.)

Thus, a plaintiff meets the burden of establishing a causal relationship between the physician's failure to inform and the injury to the plaintiff by demonstrating that a prudent person in the plaintiff's position would have declined the procedure if adequately informed of the risks. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 245.) As explained in *Cobbs,* the objective standard, which in effect equates the plaintiff with a reasonable person, is appropriate because it protects the defendant-physician from the self-serving testimony of a plaintiff who inevitably will assert at trial that he or she would have refused the procedure if duly advised of the risk. (*Ibid.*) Further, such a standard is an effective one to guide plaintiffs, courts and juries. The basic premise of law governing all aspects of human behavior is the rule of reason and we should not seek to avoid it.

However, the objective test required of the plaintiff does not prevent the defendant-physician from showing, *by way of defense,* that even though a reasonably prudent person might not have undergone the procedure if properly informed of the perils, this particular plaintiff still would have consented to the procedure. (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 295, fn. 5.)

Nonetheless, Dr. Schecter argues the trial court erred in failing to instruct the jury Warren was required to meet *both* the objective and subjective tests. He relies on a passage from Justice Mosk's dissenting opinion in *Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 179 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903], which states ". . . it is not even

enough [in an informed consent case] for the plaintiff to prove that he personally would have refused consent to the proposed treatment if he had been fully informed; he must *also* prove that in the same circumstances no reasonably prudent person would have given such consent." (Italics added, original italics deleted.) Reading this language in light of *Truman*, we construe it as recognizing that *in those cases* where a physician has raised "the *defense* that even given adequate disclosure the injured patient would have made the same decision" (*Truman*, v. *Thomas*, *supra*, 27 Cal.3d at p. 295, fn. 5, italics added), to prevail the plaintiff must satisfy both the objective and subjective tests.[9]

In sum, it was not Warren's burden to establish she would not have consented to the surgery even if adequately informed. Under the objective standard, Warren only had to prove a prudent person in her position would not have consented if adequately informed of the risks. (*Cobbs* v. *Grant*, *supra*, 8 Cal.3d at p. 245.)

We conclude this standard adequately defines the plaintiff's burden and gives appropriate direction to the trier of fact. The assertion Warren would have submitted to the surgery even with full disclosure of the risks was a *defense* as to which Dr. Schecter had the burden. (*Truman* v. *Thomas*, *supra*, 27 Cal.3d at p. 295, fn. 5.) Thus, the given instruction was proper and Dr. Schecter's failure to request an additional defense instruction in this regard waived the issue.[10, 11]

---

[9] With respect to the applicable standard, we note Justice Mosk went on to observe: " '[T]he vast majority of jurisdictions that have considered the issue apply an objective standard,' focusing 'on what a *reasonable* patient in the plaintiff's position would have done if adequately informed.' [Citation.] [¶] The rule is also incorporated in a standard jury instruction: failure to disclose before obtaining consent results in liability 'if a reasonably prudent person in the patient's position would not have consented to the [treatment] [operation] if he or she had been adequately informed of all the significant perils.' (BAJI No. 6.11 (7th ed. 1986 bound vol.).)" (*Moore* v. *Regents of University of California*, *supra*, 51 Cal.3d at p. 180, fn. 26 (dis. opn. of Mosk, J.).)

[10] It "is settled that a party may not complain on appeal that an instruction *correct in law* is too general or incomplete unless he had requested an additional or qualifying instruction. [Citations.]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 948 [160 Cal.Rptr. 141, 603 P.2d 58], italics added; accord *Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 334 [5 Cal.Rptr.2d 594].)

[11] Even assuming the trial court should have instructed the jury Warren also had to meet a subjective test, i.e., that she would have refused the surgery if properly advised, there is no "reasonable probability" the instructional omission affected the verdict. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 582 [34 Cal.Rptr.2d 607, 882 P.2d 298].) As indicated, Warren testified she would *not* have consented to either surgery if duly advised of the risk.

7. *No merit to Dr. Schecter's contention the jury's finding of negligence is tainted by evidentiary and instructional errors.*

a. *Evidentiary issues unavailing.*

■ Dr. Schecter contends the judgment "should be reversed due to the strong likelihood that it is improperly based on the irrelevant evidence of information unrelated to the risk of bone disease that could have been, but was not, presented to plaintiff." Dr. Schecter argues the trial court committed evidentiary error in that Warren's "evidence of alternatives to surgery and information about her condition that 'could' have been imparted to her was irrelevant to [her] theory of negligence" and therefore should have been excluded.

Our review is governed by Evidence Code section 353, which provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

On this record, the assertion the verdict was based on evidence unrelated to the risk of bone disease is based on sheer speculation. It is uncontroverted Dr. Schecter did not disclose to Warren the risk of metabolic bone disease. Dr. Schecter testified that osteoporosis and osteomalacia were not among the risks he would have mentioned to Warren, because he did not believe those conditions were complications or consequences of the 1982 and 1985 surgeries. However, the evidence established those conditions were a known risk of the surgeries. Arthur Donovan, M.D., a defense expert, admitted on cross-examination that since 1960, the reported rate or incidence of metabolic bone disease after gastric surgery was up to 42 percent. In view of Dr. Schecter's clear failure to advise Warren of the substantial and known risk of bone disease, we reject his contention there is a "strong likelihood" the verdict was based on evidence unrelated to the risk of bone disease.

b. *The purported "instructional" issue is devoid of merit.*

■ The record reflects that at the commencement of the trial's second phase relating to the issues of liability and damages, the trial court stated:

"Welcome back everyone. . . . In a moment you are going to be hearing from both counsel, who have an opportunity to present opening statements just directed to this portion of the trial. Before they do begin, however, I would like to advise you that with respect to this portion, there is no allegation in this litigation that Dr. Schecter was negligent in either his choice of surgical procedures or the manner in which the surgeries were performed. *The issue of liability here will involve whether or not Dr. Schecter provided Janet Warren with the required information regarding the risks and benefits of these surgical procedures prior to obtaining her consent for the operations or what is commonly called informed consent.* The trial of this portion is going to proceed procedurally just like the first phase." (Italics added.)

According to Dr. Schecter, in making this introductory statement, the trial court "erroneously *instructed* the jury that *all* aspects of [his] disclosure, not just the failure to discuss bone disease, could give rise to liability. . . . [¶] This *instruction* is diametrically opposed to the theory on which the statute of limitations phase of the trial was premised." (Third italics added.)

The contention is misleading and fails for numerous reasons.

First, this prefatory statement by the trial court, welcoming the jury back at the opening of the second phase of the trial, was not an "instruction" to the jury within any reasonable contemplation of the term. The jury was instructed much later, at the close of the evidence in the second phase of the trial.

Further, no objection was made by defense counsel to what was only a general description of the issue to be tried in the second phase.

Moreover, the statement is not susceptible to the interpretation urged by Dr. Schecter. The trial court merely advised the jury "[*t*]*he issue of liability here will involve whether or not Dr. Schecter provided Janet Warren with the required information regarding the risks and benefits of these surgical procedures prior to obtaining her consent for the operations or what is commonly called informed consent.*" (Italics added.) If defense counsel believed the trial court's remark was in any way ambiguous or inaccurate, it could have sought an immediate clarification. That was not done.

For these reasons, Dr. Schecter's claim of "instructional" error fails.

## DISPOSITION

The judgment is affirmed. Warren to recover costs on appeal.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied October 10, 1997, and appellant's petition for review by the Supreme Court was denied November 25, 1997.