[No. B195944. Second Dist., Div. Three. June 14, 2007.]

ANTOINE GARABET et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ARA BOGHOSIAN, Real Party in Interest.

COUNSEL

Bonne, Bridges, Mueller, O'Keefe & Nichols, Gregory D. Werre, Vangi M. Johnson and Keith M. Rozanski for Petitioners.

No appearance for Respondent.

Cron, Israels & Stark, Edward C. Stark and Dana C. Reimus for Real Party in Interest.

OPINION

ALDRICH, J.—

## INTRODUCTION

This is an action for medical malpractice brought by real party in interest and plaintiff Ara Boghosian (Boghosian) against petitioners and defendants Antoine Garabet, M.D., and Laser Eye Medical Office, collectively defendants. Boghosian alleges defendants performed LASIK surgery on him with knowledge that he was not an appropriate candidate for the medical procedure.

Defendants have requested a writ of mandate directing the trial court to vacate its order denying their summary judgment motions and instead to grant the motions. Defendants contend the statute of limitations (Code Civ. Proc., § 340.5) for Boghosian's lawsuit expired before the lawsuit was filed. We conclude that defendants' argument is persuasive and hold, as a matter of law, that there are no triable issues of fact. Thus, we grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Underlying facts*[1]

On July 21, 1998, Boghosian visited defendants in the hopes of correcting his vision such that he would no longer require corrective lenses. Boghosian underwent a thorough eye examination. Defendants informed him that he suffered from an astigmatism and myopia and was a good candidate for LASIK surgery.[2]

On August 8, 1998, Boghosian underwent LASIK surgery on both eyes. The surgery was performed by Dr. Garabet.

Prior to having surgery, Boghosian signed a consent form disclosing the potential complications of the surgery. Among other risks of the surgery, the consent form notified Boghosian that: (1) there was no guarantee his vision would be corrected; (2) he might experience halo rings around light; (3) he could become farsighted or overcorrected in one or both eyes; (4) he might experience sensitivity to sunlight; (5) there was a possibility that fluctuations or variations in vision could occur; and (6) additional surgery might be needed if he suffered any of the potential vision difficulties.

Within weeks after surgery, Boghosian began to experience a number of symptoms, including, cloudy vision, dryness, double vision, and loss of visual acuity and sharpness in both eyes. Over time, many of these problems remained constant or worsened. Boghosian told defendants of these problems. Defendants at times told Boghosian there was nothing to be concerned about, many LASIK patients experienced similar symptoms, and the symptoms were normal. Based on these assurances, Boghosian was of the "impression that [his] procedure was not successful."

---

[1] In that we are reviewing motions for summary judgment, we construe the facts in the light most favorable to Boghosian, the party who opposed the motions. (*Daniels v. DeSimone* (1993) 13 Cal.App.4th 600, 606 [16 Cal.Rptr.2d 615].)

[2] LASIK is the commonly used name for "laser assisted in situ keratomileusis."

Boghosian continued to receive treatment from defendants for more than two and one-half years after the surgery. Defendants prescribed artificial tears and placed plugs in Boghosian's tear ducts. At the last visit on April 25, 2001, Boghosian elected to forgo additional surgery and defendants prescribed corrective lenses.

Boghosian did not again seek treatment for his vision problems until the summer of 2004. During July 2004, Boghosian consulted Dr. Phillip Wren at Excel Laser Vision. Boghosian reported that his vision had taken a turn for the worse in the prior year. Dr. Wren, a former employee of defendants and a friend of Boghosian's, told Boghosian that his astigmatism could be worsening. Dr. Wren recommended contact lenses and a "touch-up" procedure to improve Boghosian's vision. Boghosian was fitted with contact lenses, but stopped using them because they caused him extreme discomfort. He reverted to glasses. Boghosian returned to Dr. Wren to discuss the recommended "touch-up" procedure. Dr. Wren recommended Boghosian see a specialist.

Boghosian was "under the impression that [his] astigmatism was at the heart of [his] visual symptoms. [He] did not attribute any of the visual problems [he] was experiencing to be the result of any wrongdoing on [defendants'] part. Furthermore, it was [his understanding] that if [his] visual problems had resulted from the LASIK procedure, the patient consent form identified them as potential complications of the LASIK procedure, and [he had] agreed and acknowledged that [he] was willing to go forward with the procedure in light of those risks."

On July 18, 2005, Boghosian consulted Dr. James Saltz. Dr. Saltz informed Boghosian that his vision problems were caused by the surgery. Dr. Saltz told Boghosian that because of the shape of his cornea, Boghosian should not have been considered a candidate for the LASIK procedure.[3] Additionally, Dr. Saltz "indicated that [Boghosian] should first undergo a procedure wherein 'intacs' are placed or implanted into each eye to stabilize the cornea. He indicated that corneal transplants for both eyes would be the next step if the intacs were unsuccessful."

---

[3] In support of this fact, Boghosian submitted his own declaration in which he declared in part, "On July 18, 2005, I had my initial consultation with Dr. Saltz. Following the examination, Dr. Saltz informed me that I was not a good candidate for the 'touch-up' procedure. During that same appointment, Dr. Saltz reviewed my medical records from [defendants] and he indicated that I should never have done the surgery in the first place. During this conversation, he showed me that a simple comparison of the examination results relating to my initial consultation on July 21, 1998 and the results obtained on the day of the LASIK procedure, (August 8, 1998) reveal irregularity in the shape of my corneas." Boghosian did not submit a declaration from Dr. Saltz.

Defendants objected to Boghosian's statements arguing they were inadmissible hearsay. Defendants asked the trial court to disregard these statements and to rule on the objection. In light of our conclusion, we need not address this evidentiary issue.

### 2. *The complaint*

On October 11, 2005, Boghosian served defendants with a letter of intent to sue. (Code Civ. Proc., § 364.)

On January 9, 2006, Boghosian filed a complaint seeking recovery for medical malpractice. Boghosian alleged in part that he had "consulted with Defendants . . . specifically for the purpose of obtaining Defendants' professional advice regarding his medical care and treatment. Defendants recommended and carried out treatment. . . . [Boghosian] relied upon the advice and representations, or lack thereof, of Defendants . . . all to his detriment." Boghosian also alleged that defendants "did negligently and carelessly examine, diagnose, advise, care, treat and administer to [him]. In their examination, diagnosis, advice, care, treatment and administration of medical care . . . , Defendants . . . failed to exercise that degree of skill and care commonly possessed and exercised by physicians, surgeons, medical doctors, specialists, nurses, technicians, medical facilities and medical practitioners who perform the same and similar treatment and diagnostic procedures in the area and areas where Defendants practice."

With regard to the statute of limitations, Boghosian alleged that "a period of one calendar year had not yet elapsed from the date [he] first learned or reasonably should have known the fact that his injuries and damages complained of . . . were a legal result of the negligent acts or omissions on the part of Defendants; and, further, that a period of three years has not yet elapsed since the manifestation of this injury, which occurred on or about July 18, 2005."

### 3. *The summary judgment motion*

Each defendant filed a motion for summary judgment. Defendants contended the one-year and the three-year statute of limitations specified in Code of Civil Procedure section 340.5 had expired. Defendants argued that the three-year provision had expired because Boghosian had not commenced his lawsuit within three years of the date of injury and the one-year provision had expired because Boghosian had not commenced the lawsuit within one year of the date he discovered, or through the use of reasonable diligence should have discovered, the injury. In support of their arguments, defendants noted that Boghosian had begun to experience problems within weeks of his August 8, 1998, surgery, yet he had not filed his lawsuit until January 9, 2006.

In opposing the motions, Boghosian argued there were triable issues of fact with regard to his claim that defendants erred in failing to tell him he was not a candidate for the LASIK procedure. Boghosian asserted that the symptoms

that developed soon after the surgery did not trigger the statute because they consisted of complications disclosed prior to surgery. He contended the action accrued on July 18, 2005, the date he consulted with Dr. Saltz and discovered the negligent cause of his injury. Boghosian argued that only "the Manifestation of an 'Undisclosed' Complication will Trigger the Limitation Period Under California Code of Civil Procedure, Section 340.5."

In denying the motions for summary judgment, the trial court concluded that Boghosian had provided facts sufficient to establish triable issues of material fact as to the date the action accrued. The trial court ruled, in part: Boghosian "has presented sufficient responsive evidence of a triable issue of material fact as to the 'date of injury' for the three-year statute of limitations under [Code of Civil Procedure section 340.5]. The issue of material fact is raised by the symptoms [Boghosian] experienced in association with his astigmatism and the advice he received from his treating physicians . . . ."

Defendants filed in this court a petition for writ of mandate seeking an order directing the trial court to vacate its order denying their motions for summary judgment and instead to grant the motions. Defendants contended the three-year statute of limitations contained in Code of Civil Procedure section 340.5 expired before Boghosian's lawsuit was filed. We issued an order directing the parties to address the issues and to appear for oral argument.

## DISCUSSION

### 1. *Standard of review*

Summary judgment is granted only when the moving party establishes the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A moving defendant seeking summary judgment has the initial burden of showing there are no triable issues of material fact and the action has no merit. In order to meet the burden, a moving defendant must provide supporting documentation which establishes either a complete defense to the plaintiff's action or demonstrates an absence of an essential element of the plaintiff's case. (*Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 661 [43 Cal.Rptr.2d 142].)

We conduct a de novo review of the trial court's decision on a summary judgment motion. (*Daniels v. DeSimone, supra,* 13 Cal.App.4th at p. 607.)

### 2. *The statute of limitations in medical malpractice lawsuits*

Code of Civil Procedure section 340.5 establishes the statute of limitations in medical malpractice lawsuits. It reads in part: "In an action for injury or death against a health care provider based upon such person's alleged

professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

■ The one-year provision begins when the "plaintiff suspects or should suspect that [his or] her injury was caused by wrongdoing . . . ." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [245 Cal.Rptr. 658, 751 P.2d 923].) With regard to the one-year limitation provision, the issue on appeal usually is whether the plaintiff actually suspected, or a reasonable person would have suspected, that the injury was caused by wrongdoing. (Cf. *Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391 [97 Cal.Rptr.2d 762].)

■ The maximum limitations period for a medical malpractice action is three years from the *date of injury*, tolled for fraud, intentional concealment, or the presence of nontherapeutic and nondiagnostic foreign bodies only. (Code Civ. Proc., § 340.5.)

■ For purposes of the statute, "[t]he word 'injury' signifies both the negligent cause and the damaging effect of the alleged wrongful act and not the act itself. (*Larcher v. Wanless* (1976) 18 Cal.3d 646, 655–656 & fn. 11 [135 Cal.Rptr. 75, 557 P.2d 507].)" (*Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 54–55 [210 Cal.Rptr. 781, 694 P.2d 1153].) There must be some manifestation of appreciable harm. (*Brown v. Bleiberg* (1982) 32 Cal.3d 426, 437, fn. 8 [186 Cal.Rptr. 228, 651 P.2d 815].) "The date of injury could be much later than the date of the wrongful act where the plaintiff suffers no physical harm until months or years after the wrongful act. [Citation.]" (*Steketee v. Lintz, Williams & Rothberg, supra*, at p. 54.) However, once there is a manifestation of the injury in some significant way, the three-year limitations period begins to accrue. (*McNall v. Summers* (1994) 25 Cal.App.4th 1300, 1311 [30 Cal.Rptr.2d 914] (*McNall*).)

By establishing a maximum length of time in which plaintiffs have to bring their medical malpractice lawsuits, "the Legislature had as a primary goal the reduction of the cost of medical malpractice insurance. However, this goal was to be accomplished in a 'reasonable' manner. . . . '[T]he statute appears to have been a compromise between concern over the extended exposure of medical practitioners to malpractice liability and a desire not to bar potentially worthy plaintiffs from court before they have a fair chance to bring suit. . . .' [Citation.]" (*Steketee v. Lintz, Williams & Rothberg, supra*, 38 Cal.3d at p. 56.)

*Hills v. Aronsohn* (1984) 152 Cal.App.3d 753 [199 Cal.Rptr. 816] (*Hills*) provides an illustration. In *Hills,* Dr. Aronsohn injected silicone into the breasts of the plaintiff between April and June 1966. In 1974, the plaintiff began to notice lumps and experience soreness. In March 1974, Dr. Kaufman ordered a mammogram, which was performed by a third doctor. The third doctor reported that the mammogram showed nodular densities typical of that seen following silicone injections. (*Id.* at p. 756.) On April 11, 1975, a fourth physician reported there were no changes from the prior year. There was a second mammogram and report from an April 25, 1975 physical examination conducted by Dr. Worton. Dr. Worton diagnosed the plaintiff as suffering from silicone granulomatosis due to silicone injections and recommended surgery. (*Ibid.*) In January 1977, Dr. Worton examined the plaintiff. The lump in her right breast had gotten larger and become more uncomfortable. (*Id.* at pp. 756–757.) Dr. Worton recommended two surgeries. The first, a bilateral subcutaneous mastectomy, was performed on February 28, 1977. The second, a reconstruction, was performed four days later. The plaintiff filed suit against Dr. Aronsohn on March 1, 1978. (*Id.* at p. 757.)

■ *Hills, supra,* 152 Cal.App.3d 753, affirmed the lower court's granting of summary judgment in favor of Dr. Aronsohn. The appellate court held there was a triable issue of fact with regard to the one-year statute of limitations as to when plaintiff reasonably could have discovered the negligent cause of her injury. (*Id.* at p. 759.) However, the three-year period had expired. *Hills* stated, "We agree that in the instant case the term injury does not refer to the date of the alleged negligence—the time in 1966 when Dr. Aronsohn gave Ms. Hills the silicone injections. . . . [T]he term injury is not synonymous with the alleged wrongful act. However, we reject [plaintiff's] conclusion that she did not experience injury until she suffered her ultimate harm in the form of the subcutaneous mastectomy. The mastectomy was an operation designed to cure the injury, and not the injury itself. [¶] . . . [¶] It follows that the event which activates the three-year limitations period is the moment the plaintiff discovers the harm caused by the alleged negligence. Or, in the words of the court in *Larcher* [*v. Wanless, supra,* 18 Cal.3d 646], the period is activated on the date of the damaging effect of the wrongful act rather than on the date of the act itself. ([*Id.* at p.] 656.) Once the damaging effect of the alleged wrongful act is apparent, the statute is activated. This event may occur even without the knowledge that negligence was the cause of the injury. [¶] Here [the plaintiff] admits she experienced soreness and noticed lumps in her breasts in March of 1974, four years before filing suit. This condition caused her to consult Dr. Kaufman later that month. This admission is sufficient to show that she suffered the damaging effect of the alleged malpractice on that date. Where 'reasonable minds can draw only one conclusion . . . the question becomes a matter of law.' [Citation.] The inescapable conclusion is that she suffered the damaging effects of the

malpractice more than three years before filing suit. Accordingly, the motion for summary judgment was properly granted." (*Hills, supra,* at pp. 762–763, fn. omitted.)

Another example is *McNall, supra,* 25 Cal.App.4th 1300, in which a directed verdict in favor of two psychiatrists was upheld on appeal. In *McNall,* the plaintiff, a nurse and nursing instructor, was being treated for depression. In 1979, she began treatment with Dr. Hall. When he was on vacation, she saw Dr. Summers and then continued to be treated by Dr. Summers. (*Id.* at p. 1304.) Dr. Pitts agreed with Dr. Summers's recommendation that plaintiff should undergo electroconvulsive therapy (ECT). After the plaintiff gave her informed consent, she began her ECT treatment in November 1979. (*Ibid.*) The plaintiff reported that she experienced severe confusion and memory loss, but thereafter continued to receive treatments. Dr. Summers advised the plaintiff that her memory would return and provided her with an article he had coauthored in which it was stated that memory deficits and confusion were "characteristic side effects" of ECT. (*Id.* at p. 1305.) When the plaintiff's memory did not improve, Dr. Summers told her that the problems were a result of her depression and that she would need a psychiatrist for the rest of her life. (*Ibid.*) From 1980 to 1984 the plaintiff complained about her depression, inability to recall, and disorientation to a colleague, to a man she was dating, and to a longtime friend and neighbor. (*Ibid.*) In a May 1980, session, Dr. Summers had sex with the plaintiff. (*Id.* at p. 1306.) In July 1982, the plaintiff terminated her therapy with Dr. Summers and resumed treatment with Dr. Hall. The plaintiff told Dr. Hall about the sexual encounter with Dr. Summers and about her continuing memory loss. Dr. Hall prescribed medication and treated the plaintiff until the end of 1984. (*Ibid.*) The plaintiff filed her complaint against Dr. Summers on October 23, 1985, alleging medical malpractice based on sexual abuse. In November 1986, a neuropsychologist concluded the plaintiff had suffered an injury to the left side of her brain. A magnetic resonance imaging test (MRI) ordered by Dr. Cummings revealed a probable stroke. The plaintiff amended her complaint to add Dr. Pitts as a defendant and to add a cause of action based on the psychiatric care encompassing the ECT treatment. (*Ibid.*) Thereafter, another test showed a well-established stroke and a doctor concluded that the plaintiff's memory loss was related to that injury, which had occurred during the ECT treatments. (*Id.* at pp. 1306–1307.) The trial court granted the defendant doctors' motion for directed verdict on grounds of the statute of limitations. (*Id.* at p. 1307.)[4]

---

[4] The trial court also granted a nonsuit to Dr. Summers with regard to the sexual abuse medical malpractice. *McNall, supra,* 25 Cal.App.4th 1300, reversed that ruling. (*Id.* at pp. 1312–1314.) We need not discuss this aspect of the case.

 · *McNall, supra*, 25 Cal.App.4th 1300, affirmed the statute of limitations ruling stating: "McNall unequivocally experienced losses of memory commencing with the ECT treatments in 1979. Memory loss is a functional deficit generally indicating an organic injury or serious psychosis. Here, not only did McNall's onset of complaints immediately follow the ECT, but both she and her physician associated the symptom with that specific treatment. There was nothing hidden about her injury. McNall fully recognized she was continuously experiencing harmful lapses in memory adversely affecting her professional and personal life. It is simply uncontroverted that McNall knew she was damaged in some way by the ECT treatments. That is sufficient to trigger the three-year period provided for in [Code of Civil Procedure] section 340.5. [¶] McNall's early complaints in 1980 to [her colleague, the man she was dating, and to her longtime friend and neighbor] demonstrate McNall was aware she had experienced manifest injury and appreciable harm which she directly associated with her ECT treatments. By her own testimony, she 'had reason to believe in March of 1984 and before March of 1984 that in fact E.C.T. had caused [her] memory problems.' Her persistent complaints to a rather large audience and her professional experiences as a registered nurse and nursing instructor cast doubt on her contention that she did not and could not reasonably be aware of the fact she was damaged—injured—by the ECT treatments until Dr. Cummings gave his diagnosis in November 1986. '[D]amage is "manifested" for purposes of commencing the three-year period when it has become evidenced in some significant fashion . . . .' " (*McNall, supra*, at pp. 1310–1311.)

In contrast, in *Steingart v. White* (1988) 198 Cal.App.3d 406 [243 Cal.Rptr. 678] (*Steingart*), the plaintiff consulted with Dr. White in 1982 after she noticed a lump in her breast. (*Id.* at p. 409.) Dr. White diagnosed the lump as a benign cyst and advised her not to be concerned. (*Ibid.*) Because she " 'had some question in [her] mind' " (*id.* at p. 410), the plaintiff asked Dr. White to order a biopsy. Dr. White told the plaintiff a biopsy was not needed. Not satisfied, the plaintiff consulted with Dr. Oliver three months later, who ordered a mammogram which confirmed the prior diagnosis. The plaintiff discovered a change in the contour of her breast. In April 1985, another doctor performed a lumpectomy and informed the plaintiff that she had "Stage II breast cancer." (*Ibid.*) She then had a radical mastectomy. (*Ibid.*) In March 1986, the plaintiff sued Dr. White for medical malpractice. The plaintiff alleged that the doctor had failed to discover, treat and manage her condition and failed to warn of the risks of cancer. We reversed the trial court's granting of summary judgment in favor of Dr. White. We held that the three-year limitation period in Code of Civil Procedure section 340.5 had not expired. (*Id.* at pp. 414–415.)

In *Steingart*, we contrasted its facts with those in *Hills, supra*, 152 Cal.App.3d 753. We stated: "There is a significant difference between the

*Hills* fact situation and the one here. Hills did not become aware of her injury at the time of her mastectomy, but at the time of the medical examination in 1974. Not only did she know of the injury at that time, but she also became aware of its relationship to silicone because her physician advised her the soreness and lumps were typical for persons receiving like injections. [¶] White would have us focus only on Hills's soreness and lumps and consider Steingart similarly, because she also had a lump in her right breast in 1982. However, although Steingart knew about the lump at the time White examined her, such a condition is not a clear indication of injury, either damaging effect or appreciable harm. Unlike Hills, Steingart was not advised the lump was the result of any earlier treatment. On the contrary, she was told repeatedly the lump was nonthreatening. [¶] Under these circumstances, we cannot equate Steingart's lump with injury. She suffered no injury until her cancer had been diagnosed. At that time, the three-year period commenced. Because the Steingarts[] filed their complaint within three years of receipt of that information, the complaint cannot be barred by application of the three-year limit in [Code of Civil Procedure] section 340.5." (*Steingart, supra*, 198 Cal.App.3d at p. 415.)

### 3. *The three-year statute of limitations expired*

Defendants are persuasive in arguing that the three-year provision of Code of Civil Procedure section 340.5 has expired.

Before we begin the discussion, we note that this case is pled as a medical misfeasance action. There are no allegations that there was a lack of informed consent.[5] Nor are there any allegations of fraud, intentional concealment, or the presence of nontherapeutic and nondiagnostic foreign bodies.[6]

---

[5] E.g., *Rainer v. Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 253 [95 Cal.Rptr. 901] ("We agree that the question of 'informed consent' with reference to the June 20, 1960, operation was not pleaded. In paragraph XII of the first count of the amended complaint in question, plaintiff alleged that the six defendant doctors originally named, 'negligently advised plaintiff that she needed surgical treatment consisting of a colectomy and an ileostomy for her condition' and that acting upon such recommendations, she authorized Drs. Moore and Gstettenbauer to perform the colectomy and ileostomy performed on June 20, 1960. This does not present any issue of whether the consent was informed or otherwise. Nor does it plead a battery.") and *Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 747 [54 Cal.Rptr.3d 527] ("Respondents argue that they did not have a duty to disclose to Ms. Hahn information that was not known to them at the time Ms. Hahn underwent the alleged unnecessary treatment. However, that is not what the complaint alleges. The complaint states that 'On or after February 6, 2002, defendants . . . negligently cared for, diagnosed and treated plaintiff [Cynthia Hahn] . . . .' The complaint *does not* state that respondents' negligence is limited to, or based on their failure to disclose.").

[6] Boghosian admits that the complaint does not raise issues of intentional concealment. He states that after depositions are taken, he will amend his complaint to add such allegations.

Boghosian suffered the damaging effects almost immediately after the August 8, 1998, LASIK surgery. Weeks after the surgery, plaintiff complained to defendants about cloudy vision, dryness, double vision, and loss of visual acuity and sharpness in both eyes. These complaints were repeated to defendants through April 2001, when plaintiff last saw defendants. Subsequently, Boghosian discussed these problems with Dr. Wren in the summer of 2004 and with Dr. Saltz in July 2005. Like the plaintiff in *McNall,* Boghosian experienced injuries that were characteristic side effects of the medical procedure. Further, like the plaintiffs in *Hills* and *McNall,* Boghosian associated the symptoms with the treatment. Thus, in order to have filed a timely lawsuit, Boghosian had to bring his lawsuit within three years of the time he first experienced these side effects, i.e., within three years of experiencing appreciable harm in 1998. He did not do so as the lawsuit was not filed until January 9, 2006.

Boghosian relies upon *Steingart.* However, as *McNall* stated: " 'We accept the *Steingart* proposition that severe damage which does not show itself (hidden cancer, for instance) is not "injury" until it is found by diagnosis. It does not follow, however, that damage which has clearly surfaced and is noticeable is not "injury" until either the plaintiff or her physician recognizes it.' [Citation.]" (*McNall, supra,* 25 Cal.App.4th at p. 1311, quoting *Marriage & Family Center v. Superior Court* (1991) 228 Cal.App.3d 1647, 1654 [279 Cal.Rptr. 475].) There was nothing hidden about Boghosian's injuries. They manifested themselves immediately after the August 1995 LASIK surgery.

Boghosian also relies on *Warren v. Schecter* (1997) 57 Cal.App.4th 1189 [67 Cal.Rptr.2d 573], in which we held that the plaintiff was entitled to compensation for all damages resulting from the medical practitioner's failure to fully disclose the risks of surgery and for the disclosed complications as well. In *Warren v. Schecter,* Dr. Schecter performed surgery in September 1982 to remove portions of the plaintiff's stomach containing an ulcer. (*Id.* at p. 1195.) Dr. Schecter did not inform the plaintiff that "decreased calcium absorption, leading to early and severe metabolic bone disease (osteoporosis, osteomalacia or bone pain)" was a common side effect. (*Ibid.*) The plaintiff developed some of the symptoms about which she had been warned (dumping syndrome involving nausea) and underwent another surgery in 1985. (*Id.* at p. 1196.) In May 1990, the plaintiff fractured her back and learned, for the first time, that a common risk of the first surgery included metabolic bone

---

However, Boghosian does not suggest that he requested a continuance of the summary judgment motion to pursue additional discovery. (Code Civ. Proc., § 437c, subd. (h).)

disease. The plaintiff filed her medical malpractice lawsuit in January 1991 under an informed consent theory. (*Id.* at p. 1197.)

In *Warren v. Schecter*, we rejected "Dr. Schecter's contention [that] Warren's cause of action accrued upon the occurrence of the disclosed complications, such as dumping syndrome . . . ." (*Warren v. Schecter, supra*, 57 Cal.App.4th at p. 1202.) We stated in part, "[u]nder Dr. Schecter's theory, by the time the undisclosed complication of bone disease materialized, the time to bring suit for failing to disclose this risk already had expired. However, an action for failure to obtain informed consent lies where 'an *undisclosed* inherent complication . . . occurs' [citation], not where a disclosed complication occurs. The complications which did occur more than three years before Warren filed suit, such as the dumping syndrome, were complications of which she previously had been warned. Therefore, the appearance of those complications did not give rise to a cause of action for failure to obtain informed consent." (*Ibid.*)

Unlike the plaintiff in *Warren v. Schecter, supra*, 57 Cal.App.4th 1189, Boghosian does not allege that defendants failed to fully disclose potential complications which appeared after the surgery. Rather, Boghosian alleges defendants should have refused to perform the surgery. Further, as noted above, Boghosian did not allege intentional concealment.

■ The LASIK surgery was performed on August 8, 1998, and Boghosian continued to consult defendants through April 2001. The lawsuit was filed in January 2006, seven years and five months after the surgery and more than four years after Boghosian last consulted defendants. "Irrespective of the one-year provision of [Code of Civil Procedure] section 340.5, its three year provision 'provides an outer limit which terminates all malpractice liability and it commences to run when the patient is aware of the physical manifestations of [his] injury *without regard to awareness of the negligent cause.*' [Citation.]" (*Artal v. Allen* (2003) 111 Cal.App.4th 273, 282 [3 Cal.Rptr.3d 458].)

Because Boghosian's symptoms, which constituted appreciable harm, were apparent immediately after the surgery, he is barred by application of the three-year outside limit contained in Code of Civil Procedure section 340.5.

## DISPOSITION

Let a writ of mandate issue directing the trial court to grant defendants' summary judgment motions and enter summary judgment for defendants. Defendants are awarded costs.

Croskey, Acting P. J., and Kitching, J., concurred.

A petition for a rehearing was denied July 16, 2007.